UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NORIS BABB

       Plaintiff,

v.                               Case No. 8:14-cv-1732-T33TBM

ROBERT A. MCDONALD, Secretary,
Department of Veterans Affairs,

       Defendant.

_____

## MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW

Pursuant to Rule 56, Fed. R. Civ. P., the Secretary of Veterans Affairs moves for summary judgment as to Plaintiff's claims on the grounds there are no triable issues of material fact and Defendant is entitled to judgment as a matter of law.

## Introduction

This case concerns the Plaintiff's pursuit in 2012 and 2013 of a promotion to GS-13, leading to the filing of her EEO Complaint in May 2013.  In March 2014, consistent with a lack of discriminatory or retaliatory intent, pharmacy management offered her two GS-13 positions, and she is currently a GS-13.

At the time of the events in this case, Dr. Noris Babb was a 52 year old[1] GS-12 clinical pharmacist assigned to the geriatric primary care ("GPC" or "Geri-PACT") clinic at the C.W. Bill Young VA Medical Center ("Young VA"), which is part of the Bay Pines VA Health Care System ("Bay Pines").  She had an Advanced Scope, which meant she could independently manage patient care for certain conditions (also known as "disease state

---

[1] All ages are as of January 1, 2013 and based on the chart produced at VA 1005 (not attached as an exhibit).

management" or "DSM").  In 2012 and 2013, the pharmacy service at the Young VA was in the process of implementing national qualification standards so that anyone who spent at least 25% of their time practicing under an Advanced Scope would become a GS-13.  In August 2012, the pharmacy service proposed a service agreement with the GPC clinic that would keep Dr. Babb practicing under an Advanced Scope, but, in December 2012, the final service agreement did not require the pharmacist to have an Advanced Scope.  After a failed attempt by the pharmacy service in February 2013 to convince the head of the Geriatric Department to revise the service agreement to include the pharmacist doing disease state management, the pharmacy service removed Dr. Babb's Advanced Scope, which she no longer needed for the position she was in.

Dr. Babb wanted to become a GS-13 clinical pharmacy specialist ("CPS"), or at least have an Advanced Scope because she speculated it would improve her chances of later becoming a GS-13.  While pharmacy management also wanted her to do disease state management in the GPC clinic, consistent with their treatment of younger pharmacists, they did not allow Dr. Babb to have an Advanced Scope once her position did not require it, did not lateral her into a position without posting it, and did not provide her training to groom her for upcoming openings in the anticoagulation clinic.  Her non-selection for those positions in April 2013 – for which she admits she lacked the relevant training and experience and for which she admits she did poorly during the interview – precipitated the filing of this complaint alleging retaliation (Count I), age and gender discrimination (Count II), hostile work environment (Count III), and injunctive relief (Count IV).

Summary judgment is warranted.  First, all five discrete acts that Plaintiff challenges

as discrimination or retaliation are either legally defective or the Plaintiff cannot show a

causal link to age, gender, or EEO activity.  Second, the hostile work environment claim

amounts to a series of events that made Dr. Babb unhappy, but are not because of age, gender

or EEO activity and are not sufficiently severe or pervasive to be a hostile work environment.

<u>**Statement of Undisputed Material Facts**</u>

**A.**      <u>**Plaintiff's Employment and Prior EEO Activity**</u>

1.   Dr. Babb[2] was a pharmacist in the GPC Clinic from 2006 to June 2013.  The GPC

clinic is part of the Geriatric and Extended Care Department, which was led at all relevant

times by Dr. Leonard Williams.  Deposition of Leonard Williams ("Williams Depo.") at

4:14-20.  According to Dr. Williams, the essential role of the pharmacist in the clinic was

"seeing the patients and going over what was usually a very complicated and long list of

medications, and looking to see if there were any obvious possibilities of drug/drug

interactions, that the physician should know about."  <u>Id.</u> at 12:21-13:7.  Until the loss of her

Advanced Scope in February 2013, Dr. Babb provided disease state management in diabetes,

hypertension, and lipids (cholesterol).  Ex. 1, ¶ 2.  Starting in 2011, her clinic was part of a

national program called PACT or Patient Aligned Care Team.  <u>See</u> Deposition of Noris Babb

("Babb Depo.") at 15:14-17.  Her first-line supervisor until February 2013 was Dr. Marjorie

Howard (34 years old).  Dkt. 27 at ¶ 4; Ex. 2.  Dr. Keri Justice (44) is the relevant Associate

Chief; Dr. Wilson (57) is the Chief of Pharmacy.  Dkt. 27 at ¶ 4.  Dr. John Hull was a

physician in the GPC clinic; he became the Medical Director of the clinic in late summer

2012.  Deposition of John Hull ("Hull Depo.") at 4:13-17; 15:24-16:4.

---

[2] Pharmacists with a Doctorate of Pharmacy (or Pharm.D.) degree are referred to as Doctor.

2.  In connection with an EEO filed by Drs. Trask (59) and Truitt (57), Dr. Babb sent statements by email to an EEO investigator on April 26, 2012, May 10, 2012, and May 11, 2012.  Dkt. 27 at ¶ 5.[3]  No direct evidence exists that pharmacy management was aware of any EEO participation activity by Plaintiff until this claim was filed in May 2013.  Dr. Babb alleges that she opposed discrimination in a February 8, 2013 conversation with Dr. Justice, id. at ¶ 7, but Dr. Babb's own summary of the conversation does not support this claim.  Ex. 3.  Dr. Justice did not understand her to be opposing discrimination.  Deposition of Keri Justice ("Justice Depo.") at 13:24-18:12.  However, by early 2013, Dr. Wilson perceived that Dr. Babb felt discriminated against.  Deposition of Gary Wilson ("Wilson Depo.) at 33:24-34:15.  Also, in January 2013, two emails show management was anticipating possible "EEO" activity, although in one of those emails, Dr. Howard was concerned about being accused of retaliation for a grievance Dr. Babb filed in December rather than prior EEO activity.  Ex. 4; Ex. 5.  See also Ex. 6 (grievance).

**B.      Dr. Howard Asks Dr. Babb About Her Interest in a Position Dr. Howard Believes Will Give Dr. Babb a Better Chance at a GS-13 (Summer 2012)**

3.  In June of 2012, Dr. Howard asked Dr. Babb if she would be interested in a position in the Module B primary care clinic of the Young VA that had recently been vacated.  Deposition of Marjorie Howard ("Howard Depo.") at 52:8-53:8.  Dr. Howard asked because she did not think Dr. Babb would meet the 25% requirement for the GS-13 promotion in the GPC clinic.  Id. at 54:19-57:14.  See also Ex. 7 at p. 5 ("[s]he said it was the only way I could get a GS-13").  Dr. Babb decided, based on providers in GPC clinic saying they would send

---

[3] Drs. Trask and Truitt filed in federal court, Case No. 8:13-cv-00536-T-35TBM.  Summary judgment was granted for the Defendant and affirmed by the Eleventh Circuit.  Trask v. Sec'y, Dept. of Veterans Affairs, 2016 U.S. App. LEXIS 6168 (11th Cir. April 5, 2016) (selected for publication).

more patients, not to pursue the Module B position.  Id.; Ex. 8.

**C.**     **Pharmacy Supported Dr. Babb's Use of an Advanced Scope During the Negotiation of the GPC Service Agreement (August 2012-February 2013)**

4.  On June 28, 2012, pharmacy management told Dr. Babb that it would handle the negotiation of the service agreement with geriatrics.  Ex. 9.  In August 2012, the pharmacy service proposed a service agreement between pharmacy and geriatrics in which the pharmacist in the GPC clinic would practice under an Advanced Scope and which was almost identical to a prior service agreement with primary care.  Babb Depo. at 19:4-21.  Dr. Babb believed she would have received a GS-13 if that had been signed.  Id.  Pharmacy management met with Dr. Williams, who told them he did not feel there was a need for the pharmacist to be doing disease state management.  Ex. 10 (management's response to the EEO investigator); Ex. 11 (Dr. Howard saying Dr. Williams does not see value in disease state management); Ex. 12 (similar).  Dr. Williams testified that the disease state management model from primary care did not fit in geriatrics because of the differences in patient populations.  Williams Depo. at 8:15-9:2; 12:10-11.  See also Babb Depo. at 40:20-41:21 (Dr. Williams said to Dr. Babb in a meeting "[m]y providers have hour-long appointments, they don't need a pharmacist doing disease state management").

5.  Dr. Babb worked with Dr. Hull and others in GPC on a separate draft service agreement; consistent with their support for Dr. Babb's use of an Advanced Scope in the GPC clinic, Dr. Babb testified that the pharmacy service made edits to that draft, but those edits did not change that the pharmacist would practice under an Advanced Scope and that

she could get a GS-13.  Babb Depo at 21:14-23:6.[4]

6.  At the same time, Chief of Geriatrics Dr. Williams and GPC Clinic Director Dr. Hull were concerned that Dr. Babb scheduling patients into a "grid" for patient encounters limited access to the pharmacist in the GPC Clinic.  Ex. 13; Williams Depo. at 12:21-15:16 ("there was no way that we could implement her working in that role and still fulfill the very – the very needed role as a consulting pharmacist in the clinic").  As Dr. Howard explained, the national scheduling directive requires that a patient visit involving use of an Advanced Scope must be scheduled.  Howard Depo. at 28:21-31:7; see also Williams Depo. at 10:18-11:14.  At Dr. Williams' request, Dr. Hull determined the maximum number of half-hour slots per day for Dr. Babb to do disease state management.  Williams Depo. at 17:2-10; 18:2-5; 19:12-23; Hull Depo. at 18:19-24; Babb Depo. at 93:25-94:19 (the slots were thirty minutes).  On September 28, 2012, Dr. Hull noted the agreement to reduce the number of patient slots to three per day from six to address concerns about Dr. Babb's availability.  Ex. 14 (Dr. Williams and pharmacy management were on the email); Ex. 7 at p. 8-9.

7.  At some point, Dr. Williams spoke to Dr. Justice, and he learned that Dr. Babb needed to see a certain number of patients per day in order to qualify for a promotion; as a result, the option of the pharmacist seeing three patients per day was taken off the table "because it wasn't going to serve any purpose because Mrs. Babbs, you know, wouldn't get the position or the grade that she wanted…so I guess from finally having figured out that there's no way that we could do that, is how we finally agreed upon the service agreement

---

[4] Also in September 2012, Dr. Babb said Dr. Howard told her not to discuss the service agreement with Dr. Williams.  Babb Depo. 16:4-18; Ex. 15; Dkt. 27, ¶ 10(c).  Dr. Babb did, however, contact Dr. Williams in November about the service agreement she worked on.  Babb Depo. at 16:25-18:4; Exs. 92 and 93.  Pharmacy management took no action in response.  Babb Depo. at 18:5-19.

with pharmacy.  In other words, we realized we couldn't – we couldn't reach a point where we could keep Mrs. Babbs and she could do what she wanted to do."  Williams Depo. at 17:2-18:23; Babb Depo. at 33:6-34:20 (Plaintiff admits that pharmacy management told Dr. Williams that more patients were necessary for her to get a GS-13).  As a result, the service agreement – which was signed on December 12, 2012 – did not include disease state management.  Ex. 16 ("purpose" section refers to clinical pharmacist; compare to Ex. 17, earlier draft by pharmacy that included CPS in "purpose" section).[5]  That final service agreement included a reference to national Geri-PACT guidance, which did not require that the pharmacist do disease state management.  Ex. 18; Babb Depo. at 37:20-38:12.

    8.  In January 2013, after the service agreement was signed, Dr. Babb had a meeting with Dr. Williams, Dr. Hull and ARNP Susan Lewis (also a provider in the GPC Clinic) in which Dr. Williams expressed that his GPC Clinic providers could do their own disease state management.  Ex. 3.  Dr. Babb felt that Dr. Hull and Ms. Lewis "stuck a knife in my back at that meeting."  Id.; see also Babb Depo. at 39:21-41:21.  In an email to Dr. Justice that day, she wrote, "They [Geriatrics] want me to do DSM, just not have a grid so Dr. Hull can walk in at any time with any question.  I said no, I have to have a grid to do DSM, I don't know what they're thinking…"  Ex. 19; Babb Depo. at 42:19-44:13.  Pharmacy management remained supportive: Dr. Justice wrote "[t]o reiterate though, the change is in no way a reflection of your performance or personal, and I am sorry you are caught in it."  Ex. 19.

    9.  Consistent with pharmacy management wanting Dr. Babb to practice under an

---

[5] Dr. Babb alleges that not participating directly in the meetings was discriminatory because another pharmacist, Dr. Lindsay Childs, participated in meetings related to her service agreement.  This issue is addressed in the hostile work environment section below.

Advanced Scope in the GPC Clinic, on February 8, 2013, Dr. Justice told Dr. Babb that "If you can convince Dr. Williams to add DSM back on to the Service Agreement we will support you"; that if Dr. Hull was okay with three appointments, "that's not enough to meet the 25% that you need to meet the requirements for the GS 13"; and that to be sure, Dr. Babb should have 4 patients per day plus one as a buffer.  Ex. 3.  On February 12, 2013, after calling Dr. Babb to confirm that Dr. Hull was okay with the patient appointments (Ex. 20), Dr. Justice emailed Dr. Williams (subject line: "GPC revisited") and asks to discuss the service agreement.  Ex. 21.  On February 14, 2013, Dr. Justice informed Dr. Babb that Dr. Williams reiterated that "he did not need disease management in GPC by pharmacy."  Ex. 3. See also Babb Depo. at 52:15-53:10 (Dr. Babb thinks Dr. Williams did not care because he did not help her keep her job).  Dr. Babb writes she is going to remain in GPC, but look for another position because "I need support from the doctors."  Ex. 2.[6]

D.    **Dr. Babb's Advanced Scope was Removed When Her Position No Longer Required It (December 2012-February 2013)**

10.    A pharmacist can have an Advanced Scope if his or her position requires it.  Ex. 22 at VA 581 (a scope of practice is "job assignment specific"); see also Trask, 2016 U.S. App. LEXIS 6168 at *8.  When the service agreement was signed, Dr. Babb's position no longer required an Advanced Scope.  Babb Depo. at 100:4-10; Wilson Depo. at 17:19-22; Howard Depo. at 45:21-25.  Once the service agreement was signed in December 2012, management provided a "change in duties notification" to Human Resources.  Ex. 23 (also noting that Dr. Babb "will likely not be happy with this decision due to the new qualification standards that

---

[6] Dr. Babb's conclusion was that the loss of her scope was "all a misunderstanding between Dr. Williams not wanting disease state management and pharmacy taking it away."  Babb Depo. at 56:1-23.  However, Dr. Williams did not testify that he "wanted" disease state management, but rather he was initially willing to allow it up to a point because he wanted Dr. Babb to stay in the clinic.  Williams Depo. 15:3-18:23.

are out nationally," but that she would not qualify as a GS-13 due to the 25% requirement).

11.   In January 2013, the pharmacy service received a request from the credentialing office to review the list of employees with Advanced Scopes to determine if they are being used.  Ex. 24 at VA 10181.  The pharmacy service submitted five individuals for whom scopes of practice should be removed.  Ex. 25.  This included Dr. Anna Meyers (31), who did not obtain a CPS float position requiring an Advanced Scope; the pharmacy considered whether to allow her to keep her scope to cover for other pharmacists, but rejected the idea. Justice Depo. at 39:22-40:10; Ex. 24 (noting Dr. Meyers "fought to keep hers").  Dr. Paige Kelley (32), who works in Home Based Primary Care ("HBPC"), which is part of the Geriatric Department, lost her scope of practice as well.  Justice Depo. at 38:2-5.[7]  Dr. Babb was on this list, and her scope was removed as of Feb, 15 2013.  Exs. 2 and 24.

**E.     Pharmacists with More Relevant Experience Were Selected for Anticoagulation Assignments for which Dr. Babb Applied (Fall 2012 – April 2013)**

12.   To work as a pharmacist in anticoagulation (blood thinners) requires an Advanced Scope for that disease state.  Ex. 1, ¶ 3.  In the fall of 2012, Dr. Babb asked to train in anticoagulation to be able to help in the area, but she was not provided that training.  Babb Depo. at 8:12-20.  Dr. Justice explained that they did not train anyone in anticoagulation at that time because they were short staffed in anticoagulation, and the training of pharmacy residents already puts a burden on the pharmacists; with respect to Dr. Babb specifically, she did not receive training because anticoagulation was not part of her assignment in the GPC clinic.  Justice Depo. at 34:9-25; see also Ex. 26.  In October 2012, the pharmacy service

---

[7] Dr. Kelley, who is still in HBPC, later regained an Advanced Scope, but remains a GS-12, as she does not see sufficient patients to qualify for a GS-13.  Justice Depo. at 108:22-110:17.

advertised an anticoagulation assignment, which said that "experience is preferred, however if an experienced pharmacist isn't interested, one will be trained." Ex. 27. Dr. Babb did not apply. Babb Depo. at 11:2-12:1.

13. Once Dr. Babb became aware of the possibility of losing her Advanced Scope in January 2013, she started asking for training again in order to improve her chances of obtaining an anticoagulation position (and the accompanying GS 13), but was not provided training. Babb Depo. at 9:9-23; 119:12-22.[8] As Dr. Babb noted, "no pharmacists ever received training" in the anticoagulation clinic. Ex. 28 at 11:24-12:2. At least three young pharmacists asked for training in anticoagulation prior to Dr. Babb, including Dr. Brian Steele (33), Dr. Carrie Davis (33), and Dr. Sarah Grawe (26), but only Dr. Steele received some training in 2011, and only until it was determined it was not necessary for his job; the training was not completed. Ex. 26; Ex. 29.[9]

14. On January 9, 2013, Dr. Stewart (41), who, among his various responsibilities, led the anticoagulation clinic at the time, asked Dr. Justice about when the next two anticoagulation assignments would be opened; Dr. Stewart described conversations with Dr. Justice about the anticoagulation positions as a "constant discussion." Deposition of Robert Stewart ("Stewart Depo.") at 13:16-14:5; Ex. 30. The January 9th email conversation then discussed various potential candidates, including that Dr. Christine Grogan (27) should go to OP (outpatient) instead of anticoagulation and that Dr. Sarah Grawe (26) was one of two potential candidates

---

[8] Drs. Trask and Truitt similarly asked for training for an upcoming position that would require an Advanced Scope and were not provided the training. Trask, 2016 U.S. App. LEXIS 6168 at *16, 25-26.

[9] The pharmacy service later decided that all pharmacists in PACT assignments should have Advanced Scopes in anticoagulation. Ex. 1, ¶ 5. Therefore, Dr. Steele received training from September 17, 2013 to May 12, 2014, receiving his Advanced Scope in May 2014, and Dr. Babb – once she received a new PACT assignment in 2014 – also began training in anticoagulation. Id.; Babb Depo. at 178:6-9.

Dr. Stewart thought would be a good fit.  Ex. 30.  On January 30, 2013, Dr. Stewart and Dr. Justice emailed after Dr. Babb expressed interest in the position and asked for training.  Ex. 5.  Dr. Justice said she thought Dr. Babb should go to the domiciliary[10]; Dr. Stewart speculated that Dr. Babb was interested in the GS level, rather than the position[11]; Dr. Justice said "I feel a EEO coming on" and Dr. Stewart responded, "Hope not."  Id.  Neither recalled discussions about specific candidates once the official list of applicants was provided.  Stewart Depo. at 20:6-21:5; Justice Depo. at 30:4-12.  Future discussions regarding Dr. Babb did not reference potential EEO activity.  See, e.g., Ex. 31 (of note, Dr. Stewart became Dr. Babb's supervisor once she was no longer practicing under an Advanced Scope).

   15.  When Dr. Babb was soliciting references for her application in March 2013, she admitted to one reference that "I don't have any anticoag experience either."  Ex. 32.

   16.  Dr. Justice put together an interview panel (see, e.g., Ex. 33) and provided sample questions to ask during the interview that had been used in prior selection processes, but said the panel should feel free to change them.  Ex. 34; Justice Depo. at 29:17-22.  As panel member Dr. Kim Hall (43) explained, "[s]ince anticoagulation experience was preferred, but not required, the clinical questions were structured in a manner that would allow a candidate without experience to still answer them correctly and score highly if they had a good understanding of anticoagulation literature and guidelines."  Ex. 35 at VA 113.  The interviews were conducted on April 16-18, 2013.  Ex. 36.

   17.  The three panel members all concluded that Dr. Amy Mack (30) and Dr. Sarah Grawe

---

[10] Dr. Babb asked for training in the domiciliary as well, and Dr. Stewart was able to provide it. Stewart Depo. at 11:21-12:8.

[11] As Dr. Babb herself said to Dr. Justice just one week later, "I'm not going to roll over and play dead, and I intend on retiring a GS 13…"  Ex. 3.

(26) were the best of the four candidates.  See Ex. 35 at VA 113-114 (Dr. Kim Hall: "the two selectees' prior experience indicated that they should be capable of doing the job in an efficient and skilled manner [and] should require little training to practice independently…"; "the [Plaintiff] did not have any direct experience in anticoagulation"; Dr. Babb's responses indicated "areas of concerns" regarding treating anticoagulation patients, as well as her interactions with co-workers); Ex. 37 at VA 120-121 (Dr. Cathy Sypniewski (47): selected candidates "had significantly more experience in the applied for position" and "were better able to answer the questions"; "overall, [Dr. Babb] did not portray the confidence level needed to dose (not just recommend), adjust, and decide when to bridge [anticoagulation patients]"); Ex. 38 at VA 127 (Dr. Stewart said that Dr. Babb's experience was "nowhere near" the selectees).  Dr. Babb admitted she did not have the necessary training and did poorly during the interview.  Babb Depo. at 115:22-116:18; 118:9-15; 124:19-25.  Dr. Wilson selected the top two candidates identified by the interview panel.  Ex. 39 at 14:7-17:6; Wilson Depo. at 13:3-22.  On April 23, 2013, Dr. Babb was informed of her non-selection.  Dkt. 27, ¶ 10(l).

18.  On May 1, 2013, Dr. Gigi Thomas (33) recommended how Dr. Babb could do better the next time an anticoagulation position opened up by testing herself against actual patient notes.  Ex. 40.  Dr. Babb did not follow the advice.  Babb Depo. at 123:21-124:18; 125:13-25.  Another anticoagulation position was posted three months later in July 2013, but Dr. Babb did not apply; she informed her friend Dr. Ellen O'Donnell (56) that she was "happy enough floating."  Ex. 41.

**F.**   **Dr. Babb Makes Various Requests, but Management Does Not Help Pharmacists Obtain Promotions or Provide Advanced Scopes When Their Positions Do Not**

**Require It (February 2013-April 2013)**

19.   In February 2013, Dr. Babb asked about lateraling into the Module B primary care

position Dr. Howard discussed with her in June 2012, but was told no.  Ex. 42.  She alleges

that she asked again after not being selected for the anticoagulation position in April 2013,

but was again told no.  Dkt. 27, ¶ 10(m).  Back in late June 2012, Dr. Natalia Schwartz (30)

similarly inquired about moving into the position in Module B, but management already

decided that the position would not be filled.  Ex. 43 at VA 11036.

20.   In early 2013, once she learned she may lose her Advanced Scope, Dr. Babb also

wanted to keep her scope to cover for others, but again management said no.  Babb Depo. at

100:7-101:19.  As noted above, management considered and rejected letting Dr. Anna

Meyers keep her scope in order to cover others.  Similarly, when a young male and young

female each tried to apply for an Advanced Scopes when their jobs did not require it,

management said no.  Ex. 44 and Ex. 45 (as Dr. Justice wrote to his supervisor in January

2013: "if Jordan [Bowmaster, 26] wants to do clinical work, he would need to apply for a

CPS position.  Until then, he shouldn't be functioning as a CPS"); Ex. 46 (telling young,

female pharmacist Dr. Kimberly Barkoviak (32) in September 2012 she could not have an

Advanced Scope).

21.   Dr. Babb filed an informal EEO complaint on May 6, 2013.  Dkt. 27, ¶ 9.

**G.**   **Dr. Babb is Unhappy in the GPC Clinic and a Co-Worker Files Reports of
Contact (February 2013 – June 2013)**

22.   Following the loss of her Advanced Scope in February 2013, Dr. Babb chose to stay

in geriatrics rather than move to the float pool, Ex. 2, but she was very unhappy at the

time.  Babb Depo. at 46:6-50:7.  In late March 2013, Dr. Justice suggested the Employee

Assistance Program ("EAP"), which Dr. Babb found helpful.  Id. at 171:4-9; Ex. 91.  In April, Dr. Justice suggested mediation with her co-workers in the GPC clinic, but the co-workers rejected the idea.  Ex. 47.  Dr. Babb then requested a move to the float pool, which took place in July.  Ex. 48.

23.  In June, rather than receive complaints verbally, Dr. Stewart (Dr. Babb's then supervisor) asked that GPC clinic staff with concerns about Dr. Babb to put their concerns in writing in the form of a "report of contact."  Stewart Depo. at 52:16-20; 53:8-12; Ex. 49.  Two reports of contact were filed in June, one alleged that Dr. Babb was rude to a patient and the other was that she was not available to her co-workers in the clinic.  Ex. 50.  Dr. Babb learned about them when she opened a sealed envelope on her desk addressed to Dr. Stewart.  Ex. 51; Ex. 52.  Dr. Stewart discussed the Reports of Contact with Dr. Babb a few weeks later.  Ex. 52; Stewart Depo. at 52:11-15; 55:10-17.  Dr. Justice and Dr. Wilson were aware of the Reports of Contact at the time.  Justice Depo. at 77:10-78:7; Ex. 53, ¶ 2.  Pharmacy management took no disciplinary action concerning these reports of contact, Babb Depo. at 140:7-25, which occurred less than two months after Dr. Babb's EEO activity, because they viewed the Reports of Contact as arising from personality conflicts.  Ex. 1, ¶ 7.

**H.**    **Dr. Babb Has Her Choice of Two GS-13 Positions (Spring 2014)**

24. In late 2013, Dr. Babb was not selected for a GS-13 position that went to Dr. Hetal Bhatt-Chugani (35).  See Ex. 54; Babb Depo. at 128:23-129:1.  In early 2014, management posted two GS-13 positions: (1) a PACT assignment split between Modules B and D (this was the previously vacant position combined with another vacancy in Module D) and (2) a half Anticogulation at Young VA and half Palm Harbor clinic position.  Ex. 55; Ex. 1, ¶ 10.

Dr. Babb was offered both jobs; with the half Palm Harbor position, older female pharmacist Dr. Linda Rolston (55) turned it down before management offered it to Dr. Babb ahead of Dr. Timothy Ebert (28).  Ex. 1, ¶ 10; Ex. 56; Babb Depo. at 139:7-23.  In March 2014, Dr. Babb accepted the Module B and D position.  Babb Depo. at 176:17-20.  On April 2, 2014, Dr. Justice submitted paperwork to the regional board for Dr. Babb to receive her GS-13.  Ex. 57; Ex. 1, ¶ 4.  Dr. Babb began in her position in May 2014.  Babb Depo. at 176:21-22.  On July 3, 2014, Dr. Justice submitted a reference for Dr. Babb for her Advanced Scope without a single negative comment, concluding that the Plaintiff "is an excellent practitioner with a broad knowledge of clinical pharmacy.  She is great with patients!"  Ex. 58, Ex. 1, ¶ 6.  The promotion to GS-13 was approved by the regional board on August 4, 2014 and approved by the Director of Bay Pines on August 5, 2014.  Ex. 59.

25.   The Module B/D position involves a compressed schedule of 9 hours per day Tuesday through Friday and 4 hours on Saturday.  Dkt. 27, ¶ 10(p).  The schedule was designed based on the goal of extended hours for primary care.  Justice Depo. at 54:9-18.  Dr. Babb understood this tour of duty when she accepted the position, but not the implications for holiday pay.  Ex. 55 (job posting); Babb Depo. at 139:7-23.  When working this schedule, she is entitled to four hours of Holiday pay for each of the five legal holidays on a Monday.  Dkt. 27, ¶ 10(p).  Dr. Babb was offered the opportunity to change her schedule permanently so that she would receive eight hours of holiday pay for Monday legal holidays, but declined.  Ex. 79.  Dr. Babb contends that other services rearrange schedules for employees who work Tuesday-Saturday so that those employees can have a three-day weekend, but pharmacy management refused to do the same.  Babb Depo. at 150:24-151:20; 153:23-154:22.  If that

request had been agreed to, Dr. Babb would have received 20 fewer hours of holiday pay, but 40 more hours of holiday excused time per year.  Id. at 152:3-25.  While Dr. Babb is the only pharmacy service employee to work her particular tour of duty, other pharmacists also work Tuesday-Saturday; the pharmacy service does not rearrange schedules so that those employees can have 3-day weekends.  Ex. 60 (includes timecards of Drs. Wortock and Blakely from January 2014, prior to Dr. Babb beginning her Tuesday to Saturday role).

I.      **Other Miscellaneous Events**

26.  In September 2012, Dr. Babb asked about attending a two-day training with the members of her clinic, but Dr. Howard said she could not, in part, because she had patients scheduled.  Dkt. 27, ¶ 10(e); Howard Depo. at 36:19-37:10.  Dr. Howard also believed that Dr. Babb would not benefit from the training because she already had knowledge of the information presented.  Ex. 61.  Dr. Hull wanted Dr. Babb to attend, but Dr. Howard did not agree.  See Ex. 62.  Previously, in June 2012, Dr. Babb asked on short notice about attending a training; Dr. Howard allowed her to go to a one-hour training because she was not scheduled to see any patients during that time.  Ex. 63; Babb Depo. at 71:18-72:20.  Also, just two weeks after the September 2012 training, Dr. Howard told Dr. Babb she could attend regular PACT meetings, even if her clinic was not going.  Babb Depo. at 69:6-17; Ex. 64.

27.  Dr. Babb also alleges the pharmacy gave additional patients to Dr. Sulik (31), the pharmacist in the Women's clinic, in order that she receive a GS-13.  Dkt. 27, ¶ 10(h).  In fact, Dr. Sulik was given an added duty of seeing women anticoagulation patients in order to respond to a national guidance regarding the treatment of women on anticoagulants.  Howard Depo. at 57:23-59:17; see also Babb Depo at 92:16-21 (Plaintiff does not challenge

16

truthfulness of legitimate business reason).

28.  On December 6, 2012, Dr. Babb filed a grievance for the mentoring element of her performance appraisal arguing she met the "substantial contribution" standard for an exceptional rating.  Ex. 6; Dkt. 27, ¶ 10(f).  Management disagreed that the class she taught qualified as a substantial contribution or that the mentoring she provided in the next fiscal year should count.  Ex. 65.  During meetings about this, there was no reference to age, gender or EEO activity.  Babb Depo. at 73:19-75:24.  The same is true of the internal emails about the topic.  See Exs. 66, 67 (with attachments).  The Director ruled in favor of the Plaintiff on the issue, and her performance appraisal was changed.  Ex. 68.

29.  During the related meeting, Dr. Wilson "harshly" "verbally reprimanded" her for distributing materials for the class not approved by the Education Department.  Dkt. 27, ¶ 10(g); Babb Depo. at 79:25-81:1; see also Ex. 94 (Plaintiff: "Gary is not nice.  HR guy was a loser.").  However, there was no official verbal reprimand as Dr. Babb received nothing in writing and nothing went into her personnel file.  Babb Depo. at 81:2-4; Ex. 69.

30.  With regard to Dkt. 27, ¶ 10j, on March 27, 2013, Dr. Wilson sent out an update in response to inquiries about the process of implementing GS 13 promotions.  Ex. 70.  The process itself began in Summer of 2012 and continued at least until the Summer of 2013.  See Ex. 71(composite of documents regarding obtaining approval for implementation, in chronological order).

31.  Plaintiff alleges that being interviewed in April 2013 in connection with an investigation into who sent a derogatory letter to Dr. Wilson contributed to a hostile work environment.  Dkt. 27, ¶10(k).  However, management did not choose who was interviewed,

which was decided by the investigatory board.  Ex. 80.[12]   The final report of the board noted

that they selected people to interview who were concerned about promotions because that

was discussed in the letter.  Ex. 72 at VA 1007.  Dr. Babb fit that criteria.  See, e.g., Ex. 3;

Babb Depo. at 108:10-19.

    32.  Dr. Babb alleges that Dr. Megan Martinez (35) received an unposted CPS float

position in October 2014 after she left her clinic, implying that Dr. Martinez was treated

differently than her.  Dkt. 27, ¶ 10(0).  Until the fall of 2014, Dr. Martinez (35), who is a GS-

13 CPS, was half-time in the endocrinology clinic (afternoons) and half-time floating

(mornings), both through areas that did and did not require an Advanced Scope.  Justice

Depo. at 48:13-49:12; Deposition of Megan Martinez ("Martinez Depo.") at 6:7-17.  When

the endocrinology clinic decided it no longer wanted a pharmacist, Dr. Martinez still needed

her Advanced Scope at least in the morning, Martinez Depo. at 10:3-9, and management used

her to float full time, particularly in response to upcoming paternity and maternity

leaves.  Justice Depo. at 50:22-51:4; Martinez Depo. at 10:11-15; 12:21-24; see also Ex.

73.  Dr. Martinez later applied for an anticoagulation position, which she received, and, more

recently, a clinical pharmacy specialist float position, which she received.  Martinez Depo. at

14:14-20; 16:16-24.

    33.  Plaintiff alleges Dr. Howard said, "When do you retire?  I mean, when does your BLS

[Basic Life Support] expire?" in a March 2012 meeting, but she does not recall any other

comments related to age by Dr. Howard.  Dkt. 27, ¶ 10(b); Babb Depo. at 130:18-132:20.

Similarly, Plaintiff alleges that Dr. Justice referred to Magic Mike as a "middle aged woman

---

[12] The attached declaration was originally submitted in connection with the Trask case as they raised a similar allegation during the litigation.

movie," (Dkt. 27, ¶ 10(d)), but she does not recall Dr. Justice ever making any other age-related comments to her.  Babb Depo. at 61:24-63:8.  Dr. Babb has never heard any comments about her EEO activity.  Babb Depo. at 113:15-114:5.

## MEMORANDUM OF LAW

Summary judgment is appropriate where the pleadings, depositions, and affidavits show no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A moving party discharges its burden by showing an absence of evidence to support the non-moving party's case.  Celotex, 477 U.S. at 325.  The burden then shifts to the non-moving party "to go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial.  Id. at 324.  Moreover, "the summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale" because the case involves questions of intent.  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004) (citation omitted).

## II.     The Retaliation and Discrimination Claims Lack Merit (Counts I and II)

To state a case of discrimination on the basis of age or gender, Plaintiff must establish she was 1) a qualified member of a protected class, 2) subjected to an adverse employment action and 3) similarly situated employees outside the protected class were treated more favorably.  See Wilson, 376 F.3d at 1087; Morris v. Emory Clinic, Inc., 402 F.3d 1076, 1082 (11th Cir. 2005).  The employee outside the protected class must be "similarly situated in all relevant respects."  Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).  A prima facie

case of retaliation requires that Plaintiffs 1) engaged in EEO activity, 2) suffered an adverse

action, and 3) that a causal link between the protected activity and the adverse action exists.

Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1328 (11th Cir. 1998).  EEO activity

includes participation in the EEO process or opposition to discrimination.  Clover v. Total

Sys. Svcs., 176 F.3d 1346, 1350 (11th Cir. 1999).  A "but for" causation standard applies to

the age and retaliation claims, while the "motivating factor" standard applies to the gender

claims.  See University of Texas Southwestern Medical Center v. Nassar, 133 S. Ct. 2517,

2522-23, 2533 (2013).

    In Davis v. Town of Lake Park, Fla., 245 F.3d 1232 (11th Cir. 2001), the court held

an adverse action requires a "serious and material change in the terms, conditions, or

privileges of employment."  Id. at 1238.  Short of "termination, failure to hire, or demotion,"

an employer's action "must, in some substantial way, alter the employee's compensation,

terms, conditions, or privileges of employment, deprive him or her of employment

opportunities, or adversely affect his or her status as an employee." Crawford v. Carroll, 529

F.3d 961, 970 (11th Cir. 2008)(quotations omitted).  In a retaliation case, an adverse action is

one that "might have dissuaded a reasonable worker from making or supporting a charge of

discrimination."  Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

    If Plaintiff establishes a prima facie case of age discrimination or retaliation, the

Defendant must articulate a legitimate nondiscriminatory, nonretaliatory reason for its

actions.  See Brooks v. County Com'n of Jefferson County, 445 F.3d 1160, 1162 (11th Cir.

2006).  This burden is "exceedingly light."  Meeks v. Computer Assocs. Int'l, 15 F.3d 1013,

1019 (11th Cir. 1994).  Plaintiff must then "introduce significantly probative evidence

showing that the asserted reason is merely pretext for discrimination." Brooks, 446 F.3d at 1163 (citation omitted). Plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." Jackson v. State of Alabama State Tenure Com'n, 405 F.3d 1276, 1289 (11th Cir. 2005) (quotations and citations omitted).

A.     **Dr. Babb Was Not Selected for the Anticoagulation Assignment Because of a Lack of Relevant Experience and a Poor Interview (¶ 10(l))**

The legitimate business reason for Dr. Wilson's selection of Dr. Mack and Dr. Grawe for the two anticoagulation positions was that the panel recommended them as the most-qualified. Wilson Depo. at 13:3-22; Ex. 39 at 14:17-17:6. Dr. Babb admitted that panel members Drs. Hall and Sypniewski were not motivated by age, gender, or retaliatory intent, Babb Depo. at 121:17-122:3, and they came to the same conclusion about the best two candidates as Dr. Stewart. See Exs. 35, 37, and 38 (all three panel members said that Dr. Babb was less qualified). No evidence exists that Dr. Wilson's decision – based on the panel members' recommendation – was related to age, gender or prior EEO activity.

Although not on the panel, Dr. Babb questions Dr. Justice's influence on the process, which included suggesting questions to be used at the interview. But Dr. Babb did not consider the questions at the interview or the score sheet to be unfair, other than the lack of points for years of experience as a pharmacist. Babb Depo. at 119:23-120:19. In addition, the questions were used in prior selections. Justice Depo. at 29:10-22. The one specific piece of advice Dr. Justice gave to the panel was not to "double count a residency (under Residency and Experience)," Ex. 74. Only the two selectees had completed residencies,

while Dr. Babb had not, so this advice could have only helped Dr. Babb.  See Exs. 75, 76,

and 77.  Dr. Justice did discuss Dr. Babb's potential candidacy with Dr. Stewart, but they did

the same for other pharmacists as well.  See Ex 5 and 30.   There is no evidence that Dr.

Justice's isolated comment about an "EEO coming on" over two months earlier influenced

the process in any way.  Nor is there evidence that Dr. Babb had been denied training to limit

her ability to obtain the job, as no evidence exists that the other applicants had been provided

training to improve their chances of selection.

    With respect to retaliation specifically, for this and the next two discrete events

(occurring before the filing of her EEO Complaint), no evidence exists that management was

aware of Dr. Babb's protected activity, nor, according to Dr. Babb's email memorializing the

February 8, 2013 conversation with Dr. Justice, was there opposition activity.  Ex. 3.  While

management may have anticipated EEO activity beginning in January 2013, and Dr. Wilson

perceived that Dr. Babb felt discriminated against in early 2013, the Eleventh Circuit has not

"considered or adopted this theory of retaliation."  See Wesolowski v. Napolitano, 2

F.Supp.3d 1318, 1343 n.28 (S.D. Ga. 2014).

**B.    Denying a Lateral Move to a Non-Existent Position is Not an Adverse
        Employment Action (¶ 10(m))**

    As to legal deficiencies with the discrete act, first, Dr. Babb asked for a lateral move

to Module B in February 2013, see Ex. 42.  Before bringing a civil action for employment

discrimination, a federal employee must exhaust administrative remedies.  See Brown v.

Snow, 440 F.3d 1259, 1262 (11th Cir. 2006).  As part of this process, an employee must

contact an EEO counselor within 45 days of the date of the matter alleged to be

discriminatory.  See 29 C.F.R. 1614.105(a)(1).  Failure to meet this 45 day requirement

warrants dismissal.  See Foxx v. Dalton, 46 F. Supp. 2d 1268, 1274 (M.D. Fla. 1999).  The issue was not raised with an EEO counselor within 45 days.  Accordingly, the claim fails.

Second, Plaintiff cannot identify a comparator.  Natalia Schwartz, a young female, asked to lateral into the position and she was told no.  Plaintiff does not identify anyone who asked and was allowed to lateral into a position in order to be eligible for a GS-13 position.

The legitimate business reasons for not lateraling Dr. Babb into Module B in 2013 include (1) no position existed at the time to lateral into (as they told Dr. Schwartz in June 2012, see Ex 43 at VA 11036) and (2) as Dr. Justice testified, the pharmacy service cannot just move her into an area with promotion potential.  Justice Depo. 64:1-65:3.

After the service agreement with Geriatrics did not require her to keep an Advanced Scope, Dr. Babb wanted pharmacy to give her a GS-13 position or, alternatively, an Advanced Scope, Babb Depo at 34:7-35:5; 99:11-16, 100:4-101:19, but no evidence exists that management treated Dr. Babb differently than other pharmacists who made similar requests.  For example, when Dr. Schwartz asked for Dr. Justice's assistance the previous summer, Dr. Justice noted that managers are not responsible for the professional development of their employees and that they cannot "groom" an employee for a position at the expense of others.  Ex. 43.  Drs. Paige Kelley and Jessica Natali (28) – who were both GS-12 PACT pharmacists because they did not spend 25% of their times practicing under their Advanced Scopes, Justice Depo. at 109:8-110:15 – asked Dr. Justice in November 2012 to be reclassified as GS-13 program managers, and she rejected the request.  Ex. 78.[13]  When management considered whether to let float pharmacist Dr. Anna Meyers keep an advanced

---

[13] Plaintiff believes that management helps certain pharmacists by classifying them as GS-13 program managers.  Babb Depo. at 175:5-8.

scope to cover for others – which was something Dr. Babb wanted, <u>see</u> Babb Depo. at 101:8-16 – management refused.  <u>See</u> Ex. 24 (noting Dr. Meyers "fought to keep hers").  When Dr. Jordan Bowmaster wanted to practice under an Advanced Scope, pharmacy management rejected it because his job did not require it, <u>see</u> Exs. 44 and 45, just as Dr. Babb's job did not require it after the new service agreement in geriatrics, Babb Depo. at 100:4-10. Management also rejected Dr. Barkoviak's request for Advanced Scope based on the requirements of her job.  Ex. 46.[14]

**C.**     <u>**Pharmacy Implementing a Required Change of Promoting Pharmacists to GS-13s Is Not a Retaliatory Adverse Employment Action (¶ 10j)**</u>[15]

First, the event – the March 27, 2013 email – is not an adverse employment action; an update on a process would not dissuade an employee from participating in the EEO process. Second, Dr. Babb cannot identify a comparator because everyone in the service was affected by the new standard, Babb Depo. at 111:13-24, although only individuals who met the standards were promoted.  Third, Plaintiff cannot show a causal connection to her age, gender, or EEO activity because, as Dr. Babb admitted, management had to implement the change.  Babb Depo. at 110:1-22.  Similarly, the legitimate business reason for the implementation was that, as Dr. Babb admitted, they had to implement it.  <u>Id.</u>

**D.**     <u>**Dr. Megan Martinez Was Not Treated More Favorably (¶ 10(o))**</u>

First, management expanding Dr. Martinez's role of floating from half-time to full-time when her clinic no longer needed a pharmacist is not an adverse employment action as

---

[14] In fact, as Dr. Babb acknowledges, her younger colleagues were also passed over for positions they wanted, including young, male Dr. Lavinghouez (32) being passed over for a GS-13 management position given to an older, female pharmacist, Emily Dierlam (58).  Babb Depo. at 171:23-173:5; Ex. 39 at ¶ 3.

[15] Dr. Babb alleges that this and the next two events are discrete acts of retaliation, but also support hostile work environment claims based on age and gender.  Dkt. 27, ¶¶ 15, 29.

to Dr. Babb.  Second, Dr. Babb cannot show a causal connection from her EEO activity in May of 2013 to management's handing of Dr. Martinez's situation in fall of 2014.  See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (a 3-4 month delay between the EEO action and the adverse action does not demonstrate causation).  Third, Dr. Martinez is not a comparator to Dr. Babb: (1) unlike endocrinology, geriatrics did not ask to be without a pharmacist; (2) Dr. Babb did not already spend half of her time floating in a role that required an Advanced Scope; and (3) when Dr. Babb left geriatrics at her own request, there is no evidence of extended upcoming leaves she could cover.

The legitimate business reason for management using Dr. Martinez as a full-time float starting in October 2014 was that they needed to use her somewhere and the pharmacy service had needs that she was capable of – and scoped for – filing.  Ex. 73; Martinez Depo. at 10:11-25; 12:21-24; 14:25-15:17.

**E.**     **Dr. Babb Receiving Holiday Excused Time the Same as Other Tuesday-Saturday Scheduled Pharmacists is Not Retaliation**

First, Plaintiff cannot show a causal link from her EEO activity in May of 2013 and management's rejecting her request to change her schedule to increase holiday excused time in fall of 2014.  Thomas, 506 F.3d at 1364.  Second, Plaintiff cannot show a comparator, a similarly situated individual that pharmacy management treated differently.  As noted, while Plaintiff contends other services may make an adjustment, pharmacy management did not adjust the schedules of other Tuesday-Saturday pharmacists in order to provide the three-day weekends that Plaintiff wants.  Ex. 60.  The legitimate business reason for rejecting Plaintiff's request is that management was not aware of any authority to adjust schedules regularly with the purpose of increasing pay or time off.  Ex. 81

Plaintiff also appears to contend that management should have taken steps to address the unfairness of only receiving four hours of holiday premium pay for the five federal Monday holidays.[16]  First, as admitted, that is the amount entitled to in her current schedule. Dkt. 27, ¶ 10(p).  Second, management did offer to permanently adjust her schedule to eight hours per day, Tuesday through Saturday, which would entitle her to eight rather than four hours of holiday premium pay for all Monday federal holidays, but she refused.  Justice Depo. at 54:2-8; Ex. 79.  Finally, Dr. Babb admitted she already makes more money than someone on a Monday through Friday eight hours per day tour due to the additional weekend pay for working on Saturday, Babb Depo. at 158:16-22, so her schedule is not "unfair."

Accordingly, summary judgment should be granted on Counts I and II.

### III.   The Series of Acts Identified by Plaintiff Does Not Rise to the Level of a Hostile Work Environment

To support a hostile work environment based on gender or age, Plaintiff must prove: 1) she belonged to a protected class; 2) she was subjected to unwelcome harassment; 3) the harassment was based on gender or age; and 4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment.  See Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002); Cobb. v. City of Roswell, 533 Fed. Appx. 888, 897 (11th Cir. Aug. 12, 2013).  To support a retaliatory hostile work environment, Plaintiff must prove: 1) she engaged in protected EEO activity; 2) she was subjected to unwelcome harassment; 3) the harassment was based on protected activity; and 4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege

---

[16] This argument appears based on Plaintiff's contention she is on a "flexible" rather than "compressed" schedule.  Dkt. 46 at pp. 12-13.  This is contrary to the Complaint, Dkt. 27, ¶ 10(p), which alleges Dr. Babb is on a compressed schedule.

of employment.  See Gowski v. Peake, 682 F.3d 1299, 1311-1312 (11th Cir. 2012).  For a

viable hostile work environment claim, one of the events must fall within the relevant statute

of limitations.  Shields v. Fort James Corp., 305 F.3d 1280, 1281-82 (11th Cir. 2002).

The "standards for judging hostility are sufficiently demanding to ensure that Title

VII does not become a general civility code."  Faragher v. City of Boca Raton, 524 U.S. 775,

788 (1998).  Thus, the harassment "must be both objectively and subjectively offensive, one

that a reasonable person would find hostile or abusive, and one that the victim in fact did

perceive to be so."  Id. at 787.  Courts consider the frequency and severity of the conduct,

whether it is physically threatening or humiliating, and whether it unreasonably interferes

with the employee's job performance.  See Mendoza v. Borden, Inc., 195 F.3d 1238, 1246

(11th Cir.1999)(en banc).  In assessing these factors, the workplace must be "'hostile or

deeply repugnant,'" not "'merely unpleasant,'" to be actionable.  Hopkins v. Baltimore Gas &

Elec. Co., 77 F.3d 745, 753 (4th Cir.1996).

**A.** **No Events Within the 45-Day Statute of Limitations are Related to Age, Gender or EEO Activity**

First, Plaintiff must show that an event within the 45-day statute of limitations related

to age, gender or EEO activity.  See Shields, 305 F.3d at 1281-82.  Other than the previously

described events, the Court has only one additional event to consider.

**1.** **Management's Testimony Under Oath is Not Based on Dr. Babb's Age, Gender, or EEO Activity (¶ 10(k))**

While management did not select who was interviewed, Plaintiff appears to contend

that Dr. Wilson and/or Dr. Justice, through their testimony, directed the AIB panel to focus

on Dr. Babb out of retaliatory animus, but the excerpts of the transcripts produced that

concern Dr. Babb do not support this.  First, with regard to Dr. Wilson, 55 pages into his first interview under oath, he was asked about Dr. Babb, and he described her variously as "not happy," "angry," and "upset."  Ex. 82.  As for Dr. Justice, she first identified Dr. Babb as one of the "squeaky wheels" in the pharmacy services; then, in response to a question about people frustrated by promotions, Dr. Justice describes the situation in geriatrics, concluding that "Dr. Babb worked very hard to become a clinical specialist.  And then when she finally had – you know, had the brass ring the – the ground rules changed.  So I can understand why she'd be upset."  Ex. 83.  The only reasonable conclusion to draw from the testimony under oath is that they testified honestly – and accurately – that Dr. Babb was unhappy at the time.  The panel then decided to interview her, likely based on Dr. Babb's concerns over not being in line for a GS-13 promotion.  See Ex. 72 at VA 1007.

Therefore, because none of the events within 45 days are based on age, gender,  or retaliation, summary judgment should be granted on the hostile work environment claim.

**B.**       **No Events Before or After the 45 Days Support a Hostile Work Environment**

None of the events before or after the 45 days were tied to age, gender or EEO activity and thus do not support a hostile work environment.  Most notably, in June 2013, management learned of two reports of contact involving allegations that Dr. Babb was rude to a patient and not available to her co-workers; management took no disciplinary action.  Babb Depo. at 140:7-25.  Dr. Babb also opened an envelope addressed to her supervisor; management took no disciplinary action.  Ex. 51; Babb 141:1-142:12.  In other words, management acted inconsistently with any retaliatory animus.

Plaintiff claims that the hostile work environment began in September 2012 with the

denial of anticoagulation training (addressed previously) and Dr. Howard not letting her go to a training with the GPC Clinic, Babb Depo. at 159:25-160:5, but Dr. Howard was consistent in letting her go to trainings when it did not disrupt patient care.[17]

Dr. Babb alleges she did not get to participate in drafting the service agreement (Dkt. 27, ¶ 10(c)), but this is inaccurate, as she worked with staff in the GPC clinic on a draft that went to Dr. Williams after edits by the pharmacy service.  There is no evidence that non-managers, on either the pharmacy or geriatric side, participated in the meetings.  In any event, Dr. Babb was first told that management would handle the service agreement on June 28, 2012, Ex. 9, around the same time management inquired if she was interested in Module B.  Her non-participation in meetings is not tied to EEO activity or a protected characteristic.

Dr. Babb alleges she was treated differently than Infectious Disease ("ID") pharmacist Lindsay Childs (28), who actively participated in the negotiation of a service agreement.  However, in that negotiation: (1) non-managers participated on both sides (see Ex. 84; Justice Decl. at ¶ 8); (2) ID was not an area Dr. Justice was substantively familiar with, so she needed assistance (see Ex. 86; compare to Justice Depo. at 79:6-22); (3) the ID negotiation also involved the drafting of treatment guidelines, unlike Geriatrics (Ex. 87 with attachments; compare to Babb Depo. 61:3-6); and (4) no evidence exists that whether the pharmacist in ID would be practicing under an Advanced Scope was at issue in the negotiation.  Dr. Babb also alleges that Dr. Lavinghousez was allowed to participate in the drafting of the ID service agreement (Babb Depo. at 27:5-24), but there is no evidence that, if

---

[17] The claim that Dr. Howard's actions in September 2012 were motivated by new retaliatory animus is belied by Dr. Babb's email back in June 2012 describing Dr. Howard to her co-workers as "Cruella."  Ex. 85.  Dr. Babb justified what she described in the email as a "terribly unchristian and cruel" comment because Dr. Howard was "harsh."  Babb Depo. at 161:3-162:6.   None of Dr. Babb's coworkers disputed the sentiment.

true, his participation determined whether he practiced under an Advanced Scope or received a GS-13 promotion, or that he even worked in that area.

The Plaintiff alleges in the Complaint that the number of patients was cut by pharmacy so that she could not meet the 25% quota and the standard for promotion, Dkt. 27, ¶ 10(h), but she admits in her deposition it was Dr. Hull's request that prompted the change. Babb Depo. at 29:13-30:18; 33:3-9.   While the Complaint alleges that this change prevented Dr. Babb from qualifying for a GS-13, Dkt. 27, ¶ 10(h), she now claims that three patients per day in half-hour time slots was sufficient because she sometimes saw more than three patients per day and regularly spent more than a half hour with them, Babb Depo. at 19:22-20:24; 85:2-19; 89:22-90:5, so management should have somehow done more to help her keep her Advanced Scope in the GPC Clinic.  First, Dr. Williams did not want Dr. Babb to see more than three patients per day, Williams Depo. at 20:16-21:7, so that was unlikely to continue.  Second, the report she relies on in her testimony, Ex. 88, only show how many appointments were scheduled, but not whether they would count towards the 25% threshold. Ex. 1, ¶ 11.[18]  Third, management consistently took the position that the pharmacist in the GPC Clinic should have an Advanced Scope, so it is not clear what else could have been done.  Fourth, at no point was Dr. Wilson or Dr. Justice made aware that Dr. Babb thought she could reach 25% with three grid slots per day, so that could not have affected their communications with Dr. Williams.  Babb Depo. at 85:2-19; Ex. 3.  Similarly, Dr. Howard also thought that Dr. Babb could not reach 25% with three per day.  Exs. 3, 23 and 89.

---

[18] A present-day review of Dr. Babb's notes from the time – in which Dr. Babb almost always identified the amount of time spent with patients in a clinical capacity – showed 54 hours practicing under an Advanced Scope over 43 clinic days, less than the 2 hours per day necessary to reach the 25% threshold.  Ex. 1, ¶ 11.

In addition, nothing supports that Dr. Sulik was given additional patients to help her obtain a GS-13 promotion; none of the relevant communications reference 25% or GS-13.   Similarly, neither the grievance involving Dr. Babb's performance appraisal or the supposed "verbal reprimand" by Dr. Wilson involved age, gender, or EEO activity.

Regarding the loss of her Advanced Scope, Plaintiff complains her scope was not set to expire until October 31, 2013, Dkt. 27, ¶ 10(i), but Dr. Meyers' was set to expire at the end of July 2013 and Dr. Kelley's at the end of January 2014; in each case, they no longer required it for their positions, which is why they were removed.   See Ex. 24.   Plaintiff claims the removal kept her from "promotable status," but Drs. Kelley and Natali had Advanced Scopes and never received promotions, while Dr. Babb obtained a GS-13 position, even though she did not have an Advanced Scope at the time.   In fact, she was offered the second GS-13 role ahead of Dr. Ebert, who had an Advanced Scope at the time.   Ex. 56; Ex. 1, ¶ 10.

Dr. Babb alleges that not telling her sooner about the change in the service agreement contributed to a hostile work environment, Babb Depo. at 38:13-39:6, but management was waiting to hear from HR.   See Ex. 90.   Dr. Babb also alleges that the delay in receiving the GS-13 from when she started in her position in May 2014 until August 2014 contributed to a hostile work environment, Babb Depo. at 177:1-178:5, but Dr. Justice submitted her paperwork to the regional board before Dr. Babb even started in the position.

Finally, the record is almost entirely lacking in comments about age, gender, or EEO activity.   The "when do you retire" question in March 2012 and the "Magic Mike" comment in summer 2012 are isolated events, and Dr. Babb cannot identify any statements she heard related to her EEO activity.

In sum, none of these events, or the events alleged as discrete acts of discrimination or retaliation described earlier, related to the Plaintiff's age or gender or EEO activity, so the Plaintiffs cannot prove a prima facie case of hostile work environment.  Trask, 2016 U.S. App. LEXIS 6168 at *34 ("must show hostile treatment was based on protected status"). Furthermore, this case does not involve allegations as severe or pervasive as cases granting summary judgment to the defendant.  Godoy v. Habersham County, 211 Fed. Appx. 850, 853-54 (11th Cir. 2006) (despite allegations of being subjected to racial slurs almost every shift, the incidents were not sufficiently "extreme" to be discriminatory under Title VII); Smith v. Naples Community Hospital, Inc., 433 Fed. Appx. 797, 800 (11th Cir. 2011) ("cumulative effect of Cooper's lack of communication, his make-work assignments, his 'petty slights,' the screaming incidents, and the other conduct…" not sufficiently severe or pervasive); Baroudi v. Sec'y Dep't of Veterans Affairs, 616 Fed. Appx. 899, 904-05 (11th Cir. 2015) (many events, including some that caused Plaintiff to be upset or humiliated, did not constitute a retaliatory hostile work environment); compare to Ray v. Henderson, 217 F.3d 1234, 1244-45 (9th Cir. 2000) (retaliatory hostile work environment when plaintiff exposed to repeated derogatory comments, including supervisors yelling at him, calling him "liar," "troublemaker," and "rabble rouser").

Therefore, summary judgment should be granted on Plaintiff's hostile work environment claim.

## Conclusion

For these reasons, Defendant's motion for summary judgment should be granted.

Respectfully submitted,

A. LEE BENTLEY, III
United States Attorney

By:      /s/ *Michael R. Kenneth*              
Michael R. Kenneth
Assistant U.S. Attorney
Fla. Bar No. 0044341
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
Telephone: (813) 274-6000
Facsimile: (813) 274-6198
Email:  michael.kennneth@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Joseph D. Magri, Esq.
JMagri@merklemagri.com

/s/ *Michael R. Kenneth*          
MICHAEL R. KENNETH
Assistant United States Attorney