UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NORIS BABB,

      Plaintiff,

v.                                    Case No. 8:14-cv-1732-T-33TBM

ROBERT A. MCDONALD, SECRETARY,
DEPARTMENT OF VETERANS AFFAIRS,

      Defendant.
_____/

## ORDER

This matter comes before the Court pursuant to Defendant the Secretary of Veterans Affairs' Motion for Summary Judgment (Doc. # 52), filed on April 1, 2016.  Plaintiff Noris Babb filed a Response in Opposition to the Motion (Doc. # 68) on May 18, 2016.  The VA filed a Reply (Doc. # 70) on June 1, 2016, and with leave of Court, Dr. Babb filed a Sur-Reply (Doc. # 74) on June 13, 2016.  For the reasons that follow, the Court grants the VA's Motion for Summary Judgment.

## I.   Background

### A.   Dr. Babb's Role as a VA Pharmacist in Geriatrics

Dr. Babb is a clinical pharmacist who is currently employed at the C.W. Bill Young VA Medical Center. (Babb Dep. Doc. # 59 at 8).  At the time of the events in question, she was approximately 52 years old and was in a GS-12 position. (Doc. # 27 at ¶ 8).  Dr. Babb worked in the geriatric primary care clinic at the VA from 2006, until June of 2013. (Babb

Decl. Doc. # 68-2 at ¶¶ 1, 26). During her time in the geriatrics clinic, she was part of an "interdisciplinary team." (Hull Dep. Doc. # 54 at 8). One of her supervisors at the geriatrics clinic, Dr. John Hull, explained: "the interdisciplinary team is a team of caregivers that work closely together to achieve better outcomes for complex patients. . . . [T]he idea is that a group of people working together and sharing information can achieve success in complex situations much better than a solo practitioner." (Id. at 8-9).

Dr. Hull explained that the patients seen at the geriatrics clinic were "the oldest of the old" facing "frailty . . . usually psychosocial problems and a high rate of dementia." (Id. at 8). Dr. Hull noted, "we try to select patients that have multiple medical, psychosocial and functional problems, which means that our rate of death is much, much higher than a regular primary care environment, and dealing with the issues of death and dying." (Id. at 7-8).

At that time, Dr. Babb held an Advanced Scope, which means that she could perform Disease State Management. (Babb Decl. Doc. # 68-2 at ¶ 5). Disease State Management entails a pharmacist independently managing patient care for specific conditions (diabetes, hypertension, and cholesterol),

including writing prescriptions for these ailments without consulting a physician. (<u>Id.</u>; Justice Decl. Doc. # 52-2 at ¶ 2).

**B.   Dr. Babb Experiences Tribulations at Work**

Starting in 2011, Dr. Babb's clinic was part of a national "Patient Aligned Care Team" or PACT program, which resulted in many staffing changes at the VA. (Justice Dep. Doc. # 55 at 41, 65; Babb Decl. Doc. # 68-2 at ¶ 8).   In 2012 and 2013, the VA was in the process of implementing national qualifications standards so that pharmacy employees who spent at least 25% of their time practicing under an Advanced Scope would be promoted to a GS-13. (Justice Dep. Doc. # 55 at 63-65; Babb Decl. Doc. # 68-2 at ¶ 11).   Understandably, Dr. Babb - a GS-12 pharmacist with an Advanced Scope - sought such a promotion.

In June of 2012, Dr. Marjorie Howard, who was Dr. Babb's supervisor at that time, suggested that Dr. Babb consider a primary care position in "Module B" of the VA that had recently been vacated. (Howard Dep. Doc. # 57 at 52). Dr. Howard brought up the Module B position because she did not think that Dr. Babb could meet the 25% requirement for the GS-13 promotion in geriatrics. (<u>Id.</u> at 54-57).   Dr. Babb declined, even though Dr. Babb recognized that her direct

3

supervisor said that moving to Module B "was the only way [Dr. Babb] could get a GS-13." (Babb Dep. Doc. # 59 at 84; Doc. # 52-2 at 29). According to Dr. Babb, treating geriatric patients was her professional calling. (Babb Decl. Doc. # 68-2 at ¶ 10).

In August of 2012, the service agreement between the pharmacy and the geriatrics clinic was being renegotiated. (Williams Dep. Doc. # 56 at 6). Dr. Babb worked with Dr. Hull and others in the geriatrics clinic on a separate draft service agreement that supported Dr. Babb's use of an Advanced Scope in the geriatrics clinic performing Disease State Management. (Id. at 17). However, the service agreement that was ultimately signed did not call for Dr. Babb to perform Disease State Management, and in February of 2013, Dr. Babb's Advanced Scope was removed. (Id. at 18; Wilson Dep. Doc. # 53 at 16).

Dr. Leonard Williams is the Chief of Geriatrics and Extended Care at the VA, Bay Pines. (Williams Dep. Doc. # 56 at 4). He was the person who decided that Dr. Babb should not perform Disease State Management on VA geriatric patients. (Id. at 12, 21). In his opinion, Dr. Babb's role as a geriatrics pharmacist was to check for dangerous drug interactions and answer patient and caregiver questions about

medications because geriatric patients are often prescribed multiple medications. (Id. at 13). Dr. Williams provided many reasons for omitting Dr. Babb's provision of Disease State Management from the service agreement: "Many times in very frail, elderly patients we don't need to treat their hypertension or we don't need to treat it aggressively as you would through [Disease State Management] protocols, because basically the damage that was going to be done by high blood pressure by that time was done." (Id. at 11). And, "it could be injurious to the patient" to try to control conditions such as high blood pressure through Disease State Management in the geriatrics department. (Id. at 12).

Dr. Williams indicated that a geriatrics pharmacist needed to be available to "let the patient know of significant potential side effects and what to look for" and "see [a] patient before they left the clinic and make sure that the patient or the caregiver understood what we were doing." (Id. at 13). If Dr. Babb was performing Disease State Management consultations with patients, "she wouldn't be able to work in the essential role of a clinical pharmacist or consulting pharmacist in the geriatric clinic; and that is one of seeing the patients and going over what was usually a very complicated and long list of medications, and looking to see

if there were any obvious possibilities of drug/drug interactions, that the physician should have known about." (Id. at 12-13).

In September of 2012, Dr. Babb sought to participate in a multi-day training, but Dr. Howard specified that Dr. Babb could not attend because (1) Dr. Babb had patients scheduled at the time of the training and Dr. Babb's attendance of the course would therefore impact patient care, (2) Dr. Babb would not benefit from the training because she already had knowledge of the information being presented, and (3) it was too late to register for the program.  (Doc. # 52-3 at 59).

In October of 2012, Dr. Howard and Dr. Babb discussed Dr. Babb's "mid-term evaluation," where Dr. Babb received "fully successful" instead of "outstanding" in mentoring. (Babb Decl. Doc. # 68-2 at ¶¶ 14-15). Dr. Babb filed a grievance with respect to her score, and eventually the "fully successful" was "upgraded" to reflect "outstanding," but Dr. Babb "felt belittled that she [was treated] this way." (Id. at ¶¶ 15-16).

C.   **Dr. Babb is not Selected for Anticoagulation**

At the time Dr. Babb realized that her Advanced Scope was in jeopardy, she started asking for training in anticoagulation, but that training was not provided.  (Babb Dep. Doc. # 59 at 9, 116).  The anticoagulation clinic was

6

understaffed, and the physician managing that clinic testified that they could never keep up with the patients' demands for anticoagulation. (Stewart Dep. Doc. # 60 at 60).

When a position was opened in anticoagulation, Dr. Babb applied. A three member panel comprised of Dr. Kim Hall, Dr. Catherine Sypniewski, and Dr. Robert Stewart conducted the interview. Dr. Hall provided detailed testimony about the interview, remembering that Dr. Babb used unprofessional language (such as "crap" and "screwed up") and harshly criticized other medical providers, which made Dr. Hall question whether Dr. Babb would be a good fit for the busy anticoagulation department where good communications skills were a top priority. (Doc. # 52-2 at 141). Dr. Sypniewski explained that the candidates that were selected had "significantly more experience" in anticoagulation when compared to Dr. Babb. (Doc. # 52-2 at 152). Dr. Stewart confirmed that Dr. Babb's anticoagulation experience was "nowhere near" the experience of the selected candidates. (Doc. # 52-2 at 160).

Dr. Babb interviewed poorly due to "anxiety and stress," admitting "that was the worst interview of my life." (Babb Dep. Doc. # 59 at 115, 124). Dr. Babb has conceded that she

did not have any direct experience independently managing anticoagulation patients. (Id. at 119). Dr. Babb was notified that she was not selected for the anticoagulation position on April 23, 2013. (Doc. # 27 at ¶ 10(l)). Two younger pharmacists Dr. Sara Grawe (age 26) and Dr. Amy Mack (age 30) scored highest at the interview and were selected for the anticoagulation positions. (Doc. # 52-2 at 160).

During the course of these and other staffing changes at the VA, someone sent an anonymous and "vulgar" letter to Dr. Gary Wilson. (Babb Decl. Doc. # 68-2 at ¶ 22). An Administrative Investigation Board was initiated to determine who sent the troubling letter.  On April 8, 2013, Dr. Keri Justice testified at the Administrative Investigation Board that Dr. Babb was one of the "mow-mows" – the "squeaky wheels" who are "never happy, always complaining." (Doc. # 68-2 at 140).  In the same Administrative Investigation Board, Dr. Wilson testified that he believed Dr. Babb "felt that [she was] discriminated against over age and sex." (Doc. # 68-2 at 122).  Dr. Babb "was really upset that anyone would think [she is] such a low person to do something like" send an anonymous letter complaining about others in a vulgar manner. (Babb Decl. Doc. # 68-2 at ¶ 22). However, it is not disputed that

26 employees were questioned about the origins of the troubling letter, including Drs. Trask and Truitt. (Doc. # 70-1 at 15).

**D.   Dr. Babb "Floats" after Module B Transfer Denied**

Dr. Babb requested a lateral transfer to Module B to work as a Clinical Pharmacy Specialist (the position that she previously rejected) in an effort to secure a GS-13 promotion, but at that point, and with the passage of approximately nine months, it was too late. (Babb Decl. Doc. # 68-2 at ¶ 21). Dr. Justice denied Dr. Babb's request to be transferred to Module B on April 24, 2013. (Id.). Notably, a younger pharmacist, Dr. Natalia Schwartz, also sought to be transferred to Module B, but management already decided that the position would not be filled. (Doc. # 52-2 at 185).

Dr. Babb continued on in the geriatrics clinic after her Advanced Scope was removed, but she was "extremely depressed." (Babb Dep. Doc. # 59 at 46). She "had gone from being a happy team player to someone that just came in, closed the door to [her] office, and left at 4:30." (Id. at 47). Dr. Babb felt like she was in "a very difficult work environment" and that "[i]t was probably the lowest point of [her] professional career." (Id. at 47-48).

9

Dr. Babb requested to move to the "float pool" in April of 2013, and began "floating" in June of 2013. (Doc. # 52-3 at 11; Babb Dep. Doc. # 59 at 128). Around that time, Dr. Babb's then supervisor, Dr. Robert Stewart, received two complaints about Dr. Babb. (Stewart Dep. Doc. # 60 at 52). The first complaint was that Dr. Babb was rude to a patient. (Babb Dep. Doc. # 59 at 142). The second complaint claimed that Dr. Babb was not available to her co-workers at the clinic. (Id. at 143). Dr. Babb learned about these complaints when she opened a sealed envelope addressed to Dr. Stewart. (Stewart Dep. Doc. # 60 at 53). Dr. Babb faced no discipline or counseling for these events, and she testified that these events did not affect her performance appraisal. (Babb Dep. Doc. # 59 at 140). Dr. Babb testified that she enjoyed her time in the float pool, (Id. at 130); nevertheless, she filed an informal EEOC complaint on May 6, 2013. (Babb Decl. Doc. # 68-2 at ¶ 24).

### E.   Dr. Babb is Offered Two GS-13 Positions

Dr. Babb continued to apply for GS-13 positions. In late 2013, Dr. Babb applied for a GS-13 position, but it was offered to a younger pharmacist, Dr. Hetel Bhatt-Chugani (age 35). (Babb Dep. Doc. # 59 at 128). However, in early 2014,

two GS-13 positions were posted: (1) a PACT assignment split between Modules B and D (this was the previously vacant position in Module B combined with another vacancy in Module D) and (2) a half anticoagulation and half Palm Harbor clinic position. (Doc. # 52-3 at 29; Babb Dep. Doc. # 59 at 134).

The job announcement for the PACT position split between Modules B and D stated that the position was comprised of "Four 9 hour shifts Tuesday through Friday 7:00 am - 4:30 pm with a 4 hour shift Saturday 8:00am-12:00pm [with] Nights, weekends and holiday on a fair and equitable rotation schedule." (Doc. # 52-3 at 30). In March of 2014, Dr. Babb accepted the PACT position split between Modules B and D. (Babb Dep. Doc. # 59 at 134, 176). On April 2, 2014, Dr. Justice submitted paperwork to facilitate Dr. Babb's promotion to GS-13. (Doc. # 52-3 at 45-46). Dr. Justice marked "excellent" on all of the forms and made handwritten comments stating that "Dr. Babb is an excellent practitioner with a broad knowledge of clinical pharmacy. She is great with patients!" (Id.). A VA Director approved Dr. Babb's promotion in August of 2014. (Doc. # 52-3 at 49-50).

After Dr. Babb started working in her new position, she felt as though she was not being treated fairly with respect

11

to holiday pay. "After reviewing her time cards, later, and time cards of other employees she learned that due to the scheduling, she was only entitled to four hours Holiday pay for each of the five legal federal Holidays on a Monday . . . [h]owever, other employees were being paid the full amount of a holiday." (Doc. # 27 at ¶ 10(p)). Dr. Babb testified, "after I found out about the Monday federal holiday issue, I was very upset about that." (Babb Dep. Doc. # 59 at 139).  The VA offered to permanently change her schedule such that she would receive eight hours of holiday pay for the Monday legal holidays, but Dr. Babb declined. (Doc. # 52-3 at 144).

> ### F.   Dr. Megan Martinez

In October of 2014, several months after Dr. Babb's appointment to her PACT position split between Modules B and D, a younger female, Dr. Megan Martinez, obtained a Clinical Pharmacy Specialist Float, GS-13, "which was not posted anywhere so that [Dr. Babb] did not know that the job opened up." (Doc. # 27 at ¶ 10(o)). Dr. Babb alleges that she would have applied for this job had it been posted. (Id.).  But, Dr. Martinez explained that her path to a GS-13 with an Advanced Scope was unique.

Dr. Martinez started out spending half of her time in

endocrinology and the other half "covering different areas of the pharmacy, clinical and nonclinical." (Martinez Dep. Doc. # 58 at 4).   When she was "covering," Dr. Martinez did "whatever . . . needed to be done" from covering clinics to checking the mail. (Id. at 5).   Regardless of her varying duties, Dr. Martinez spent 25% of her time doing Disease State Management. (Id. at 9).   Nevertheless, the endocrinology physicians did not sign off on her Advanced Scope. (Id. at 10).   Dr. Martinez retained her Advanced Scope because she left endocrinology altogether and spent 100% of her time covering for clinical and nonclinical tasks.  She covered for two PACT pharmacists who took maternity leave: "one was out for three months and then the other was out for about six weeks." (Id. at 15).   After covering for others for seven months with an Advanced Scope and performing Disease State Management, Dr. Martinez applied and was hired for an open anticoagulation position. (Id. at 14-15).   At the time of her deposition on February 19, 2016, Dr. Martinez explained that she was leaving the anticoagulation department and taking a "CPS float position." (Id. at 16-17).

G. **Related Prior Litigation and EEOC Activity**

On February 26, 2013, Donna Trask and Anita Truitt (both VA pharmacists) filed an age and gender discrimination suit

13

against the VA. (8:13-cv-536-MSS-TBM).   In connection with those proceedings, Dr. Babb sent statements in support of Drs. Trask and Truitt by email to an EEOC investigator on April 26, 2012, May 10, 2012, and May 11, 2012. (Doc. # 27 at ¶ 5; Babb Dep. Doc. # 59 at 112-113).   She also provided deposition testimony in support of Drs. Trask and Truitt on March 24, 2014. (Doc. # 68-2 at 38).

Dr. Babb testified in this case that "my whole career had changed after I had been a witness in the Truitt and Trask case.  That up until then pharmacy administration had been in support of me." (Babb Dep. Doc. # 59 at 48). Dr. Babb specified that after she "participated in the EEO activity for Drs. Truitt and Trask, [her] career took a turn in a bad direction." (Id. at 112).   Along the same lines, Dr. Babb testified: "Everything that happened in disqualifying me was after I testified in the Truitt and Trask case; and Truitt and Trask were discriminated against because they were older females." (Id. at 110).

The district court did not agree that Drs. Trask and Truitt were discriminated against and granted summary judgment in favor of the VA on March 19, 2015. (Case No. 8:13-cv-536-MSS-TBM Doc. # 101). The Eleventh Circuit affirmed in a published decision.  Trask v. Sec'y, Dep't Veterans Affairs,

822 F.3d 1179 (11th Cir. Apr. 5, 2016).

Dr. Babb also participated in her own protected activity. She verbally opposed age and gender discrimination in a lengthy conversation with Dr. Justice on February 8, 2013. Dr. Babb requested that her union representative be present at the February 8, 2013, meeting where she voiced her complaints to Dr. Justice, but the representative failed to appear. (Doc. # 68-6 at 86).  In addition, Dr. Babb filed an informal EEOC complaint on May 6, 2013, and also initiated this lawsuit.

After opposing discrimination on February 8, 2013, Dr. Babb emailed Dr. Justice on February 22, 2013, telling her: "you need to pray for guidance" because Dr. Babb "thought that [Dr. Justice] needed to be a little bit more Christian in the decisions that she made." (Babb Dep. Doc. # 59 at 163; Doc. # 59 at 218).  Dr. Babb testified that Dr. Justice: "created an extremely hostile work environment for me.  She discriminated against me based on my age, my gender and retaliated against me.  None of those are Christian values, and I thought that it would be prudent of me to bring to her attention that she should ask God for guidance, because I felt that she really needed that." (Babb Dep. Doc. # 59 at 163).

**H.   Comments on Age, Gender, or EEOC Activity**

Dr. Babb alleges Dr. Howard asked in March of 2012, when

15

Dr. Babb planned to retire. (Id. at 130). Dr. Howard does not remember asking Dr. Babb this question. (Doc. # 52-3 at 57). Dr. Babb had a negative relationship with Dr. Howard and called Dr. Howard "Cruela" and other names in emails to her colleagues because Dr. Babb felt Dr. Howard was "harsh in meetings" and "wasn't gentle and friendly." (Babb Dep. Doc. # 59 at 161; Doc. # 59 at 216).

In addition, when a co-worker asked Dr. Babb if she had seen the movie "Magic Mike," Dr. Justice remarked that the movie was geared toward middle-aged women, which made Dr. Babb upset. (Babb Dep. Doc. # 59 at 61). Dr. Babb testified that she would not have been worried if Dr. Justice called the movie a "chick-flick," but she felt "middle-aged" was not an appropriate comment. (Id. at 62-63). When Dr. Justice referred to Dr. Babb as a "mow mow," Dr. Babb thought that Dr. Justice was calling her a "grand ma." (Id. at 61).

Dr. Babb does not recall any other comments about her age or gender and she has never heard any comments about her EEOC activity. (Id. at 61, 113, 114, 130). Dr. Babb also revealed during her deposition that she "took it all personally" and she "couldn't stop crying." (Id. at 183-184).

## I.   **Dr. Babb Files this Lawsuit**

On July 17, 2014, Dr. Babb filed her Complaint alleging

sex and age discrimination (count I), retaliation (count II), hostile work environment (count III), and injunctive relief (count IV). (Doc. # 1). The Court held a Case Management Hearing on September 10, 2014, and at that hearing, authorized Dr. Babb to file an amended complaint. (Doc. # 10). On October 10, 2014, Dr. Babb timely filed her First Amended Complaint containing the same counts. (Doc. # 12). The VA filed a Motion to Dismiss the First Amended Complaint (Doc. # 14), but that Motion was denied as moot after Dr. Babb filed a Second Amended Complaint, with leave of the Court. (Doc. ## 17, 18).

The Second Amended Complaint, filed on November 12, 2014, contained the same counts as the prior versions of the Complaint. (Doc. # 19). On November 21, 2014, the VA filed a Motion to Dismiss the Second Amended Complaint. (Doc. # 20). The Court granted the Motion but once again authorized Dr. Babb to amend her claims. (Doc. # 22). Dr. Babb filed her Third Amended Complaint on December 19, 2014. (Doc. # 27). The Third Amended Complaint is the operative Complaint and contains the following counts: retaliation (count I), gender and age discrimination (count II), hostile work environment (count III), and injunctive relief (count IV). The VA moved to dismiss the Third Amended Complaint (Doc. # 28), but the

17

Court denied the Motion. (Doc. # 30).  At this juncture, the
VA seeks summary judgment on each of Dr. Babb's claims.

## II.  <u>Legal Standard</u>

Summary judgment is appropriate "if the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(a). A factual dispute alone is not enough to defeat
a properly pled motion for summary judgment; only the
existence of a genuine issue of material fact will preclude a
grant of summary judgment.  <u>Anderson v. Liberty Lobby, Inc.</u>,
477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a
reasonable jury could return a verdict for the nonmoving
party. <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742
(11th Cir. 1996) (citing <u>Hairston v. Gainesville Sun Publ'g
Co.</u>, 9 F.3d 913, 918 (11th Cir. 1993)).  A fact is material if
it may affect the outcome of the suit under the governing law.
<u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir.
1997).  The moving party bears the initial burden of showing
the court, by reference to materials on file, that there are
no genuine issues of material fact that should be decided at
trial. <u>Hickson Corp. v. N. Crossarm Co., Inc.</u>, 357 F.3d 1256,
1260 (11th Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477

U.S. 317, 323 (1986)).  "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial."  Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor.  Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003).  If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment.  Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)).  However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required.  Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981), cert. denied, 456 U.S. 1010 (1982).

III. **Analysis**

A. **Count I - Retaliation**

1. **Dr. Babb's Prima Facie Case**

Title VII makes it illegal for "an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e-3(a). The Age Discrimination in Employment Act also includes an anti-retaliation provision. <u>See</u> 29 U.S.C. § 623(d). "To establish a prima facie case of retaliation, plaintiffs must prove that (1) they engaged in statutorily protected conduct; (2) they suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." <u>Trask</u>, 822 F.3d at 1193-94 (citing <u>Butler v. Ala. Dep't of Transp.</u>, 536 F.3d 1209, 1212-13 (11th Cir. 2008)).

After the plaintiff has established her prima facie case, the defendant has the opportunity to articulate a legitimate and non-retaliatory reason for the challenged employment action. <u>Pennington v. City of Huntsville</u>, 261 F.3d 1262, 1266 (11th Cir. 2001). "The ultimate burden of proving by a

preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff." Id.

The first element of Dr. Babb's prima facie case is satisfied because Dr. Babb engaged in protected activity when she participated in Drs. Trask and Truitt's employment discrimination lawsuit. It is not contested that she provided testimony on behalf of Drs. Trask and Truitt during multiple phases of their employment discrimination case against the VA. She not only testified on behalf of others that she felt were discriminated against, she has also pursued her own claims against the VA for discrimination and retaliation. In addition, Dr. Babb verbally opposed what she felt were discriminatory practices in lengthy conversation with Dr. Justice on February 8, 2013.

The second element is also satisfied. Dr. Babb claims that she faced adverse employment actions when her Advanced Scope was removed, in her non-selection for the anticoagulation position, in the denial of a lateral move to Module B, when a younger pharmacist, Dr. Martinez, was given a GS-13 position that was not advertized, and with respect to holiday pay. (Doc. # 27 at ¶ 15). An adverse employment action requires "a serious and material change in the terms,

21

conditions, or privileges of employment." Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir. 2001). "Short of termination, failure to hire, or demotion," an employer's action "must, in some substantial way, alter the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect his or her status as an employee." Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008).

Dr. Babb has described adverse employment actions directly impacting the terms of her employment - specifically her pay (including holiday pay). The removal of Disease State Management and of her Advanced Scope blocked her promotion (at least temporarily) from GS-12 to GS-13. In addition, her non-selection for anti-coagulation and the denial of a lateral transfer to Module B also delayed her in reaching her GS-13 goal.

As to the third element, a reasonable jury could determine that Dr. Babb established causation because she participated in protected activity and faced adverse employment actions shortly thereafter. Dr. Babb's protected activity in the Trask and Truitt case started when she provided statements to the EEOC in April and May of 2012. Her EEOC activity in that case continued through March 24, 2014,

22

when she testified in a deposition. (Doc. # 68-2 at 38).  Dr. Babb had a pointed conversation with Dr. Justice on February 8, 2013, opposing gender and age discrimination, and she filed a complaint with the EEOC in her own case alleging discrimination on May 6, 2013.

Dr. Wilson, the Chief of Pharmacy Service at Bay Pines, testified that he "was notified" when Dr. Babb initiated informal EEOC activity, and was specifically aware of her EEOC activity as of May of 2013. (Wilson Dep. Doc. # 53 at 7, 27). He testified that in early 2013, Dr. Babb was being perceived as "part of a group of people that felt they were being discriminated against on the basis of age and gender." (Id. at 34).  Dr. Wilson is a decision maker in the pharmacy department and was the "deciding official" for Dr. Babb being "placed in a PACT position in 2014." (Id. at 44).

In addition, although Dr. Justice testified that she was not aware of Dr. Babb's participation in the case brought by Drs. Trask and Truitt (Justice Dep. Doc. # 55 at 134-135), Dr. Babb complained directly to Dr. Justice that older females were not being promoted. (Id. at 14). In addition, the record shows that Dr. Justice emailed Dr. Stewart on January 30, 2013, stating that she felt EEO activity was "coming on" regarding Dr. Babb. (Id. at 46; Stewart Dep. Doc. # 60 at 43).

"Close temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated." <u>Bass v. Bd. of Cty. Comm'rs</u>, 256 F.3d 1095, 1119 (11th Cir. 2001). In addition, "A causal relationship might reasonably be inferred from a series of adverse actions that commenced immediately after a plaintiff engaged in protected activity." <u>Baroudi v. Sec'y, Dep't Veterans Affairs</u>, 616 Fed. Appx. 899, 903 (11th Cir. 2015)(citing <u>Wideman v. Wal-Mart Stores, Inc.</u>, 141 F.3d 1453, 1457 (11th Cir. 1998)). Here, Dr. Babb verbally opposed age and gender discrimination (specifically complaining that older female pharmacists were not being promoted) in a 40-minute encounter with Dr. Justice on February 8, 2013 (Doc. # 59 at 203-204), and Dr. Babb's Advanced Scope was removed just days later on February 15, 2013. (Babb Decl. Doc. # 68-2 at ¶ 19).[1] Not long after that, on April 24, 2013, Dr. Justice denied Dr.

_____

[1] Removal of Dr. Babb's Advanced Scope was contemplated long before her February 8, 2013, opposition to discrimination, and thus, the February 8, 2013, meeting with Dr. Justice could not be the but for cause motivating the removal of the Advanced Scope. <u>See</u> <u>Trask</u>, 822 F.3d at 1194 ("Because pharmacy management had already decided to reassign module pharmacists who were not selected for PACT positions to the float pool following the implementation of PACT, the plaintiffs' protected activity could not have been the but-for cause of their reassignment."). The Court nonetheless will discuss the removal of the Advanced Scope in an effort to explain why the VA's collective, challenged employment decisions were free of a retaliatory or discriminatory motive.

Babb's request for a lateral transfer (and accompanying raise to a GS-13 position). (Id. at ¶ 21). Dr. Babb's unsuccessful anticoagulation interview and non-selection for that GS-13 position also occurred in April of 2013. Further, Dr. Babb submits that she gave testimony in the Trask and Truitt case on March 24, 2014, and that she was denied holiday pay during the same time frame in March of 2014.

### 2. VA's Legitimate and Non-Retaliatory Reasons

The VA has offered a legitimate and non-retaliatory reason for every employment action that it took with respect to Dr. Babb, and Dr. Babb has not pointed to any weaknesses, implausibilities, or flaws in the VA's employment justifications for its actions such that a reasonable juror could find that the VA's proffered reasons are a pretext for retaliation. The Court will address each specific employment action Dr. Babb challenges below.

### a. Removal of Advanced Scope

Dr. Williams was the decision maker that removed Disease State Management from the contract between the pharmacy and the geriatric clinic. Once Disease State Management was removed from the contract, it was no longer necessary for Dr. Babb to work under an Advanced Scope and that Scope was removed. Dr. Williams provided several reasons for his

decision to remove Disease State Management from Dr. Babb's services. He explained that it was more important for Dr. Babb to check for dangerous drug interactions for the geriatric patients and to consult with those patients and their caregivers about medicines and side effects than it was to manage Disease States, such as high blood pressure and cholesterol. (Williams Dep. Doc. # 56 at 13).

Dr. Williams explained that the geriatric patients presented complex cases, were often frail, and that it could be dangerous to treat those patients pursuant to Disease State Management protocols. (Id. at 11). He determined it was better to leave the treatment of complex geriatric patients to the geriatric clinic physicians and that the pharmacists were best utilized performing the traditional roles of patient consultation as to medications and side effects. (Id. at 11-13).

"Pretext means more than an inconsistency or a mistake, pretext is 'a lie, specifically a phony reason for some action.'" Austin v. Progressive RSC, Inc., 510 F. Supp. 2d 855, 866 (M.D. Fla. 2007)(quoting Silvera v. Orange Cty. Sch. Bd., 244 F.3d 1253, 1261 (11th Cir. 2001)). A proffered reason is pretextual when it is false and the true reason is

26

impermissible. <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 515 (1993).

"A plaintiff cannot establish pretext by merely questioning the wisdom of the employer's reasoning, especially where 'the reason is one that might motivate a reasonable employer.'" <u>Austin</u>, 510 F. Supp. 2d at 866 (quoting <u>Lee v. GTE Florida, Inc.</u>, 226 F.3d 1249, 1255 (11th Cir. 2000)).

Dr. Babb has not pointed to any evidence that discredits Dr. Williams' reasons for the removal of Disease State Management and her Advanced Scope.  Dr. Babb wishes that she could have stayed in the geriatrics clinic operating under an Advanced Scope being promoted to GS-13 in that department, but she has not demonstrated that Dr. Williams' decision, which is founded upon providing the best possible medical care to frail and complex patients with high rates of death, was tainted by a retaliatory animus.  Dr. Babb has not met the VA's reason for its decision "head on" and has not rebutted the VA's reason for the removal of her Advanced Scope. <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1030 (11th Cir. 2000)("A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer.  Provided that the proffered reason is one that might motivate a reasonable employer, an employee

27

must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."). Dr. Babb has not presented an issue of fact for resolution by a jury on the issue of pretext because her arguments do nothing more than express her "dismay" at her Advanced Scope being removed and suggest that the geriatric patients would have benefitted from her managing their Disease States. (Doc. # 68 at 5). Her arguments amount to nothing more than a quarrel with the decision-maker's judgment. Dr. Babb falls well short of her burden of demonstrating "such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." Rioux v. City of Atlanta, 520 F.3d 1269, 1275 (11th Cir. 2008).

This Court must not substitute its judgment for the employer's business decision. Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991). Here, the decision maker stated that elderly and frail geriatric patients would be adversely affected in the instance that a pharmacist practicing Disease State Management was in charge of monitoring their high blood pressure and other ailments rather than performing the more traditional role of checking for

adverse reactions between medications.   He explained that geriatric patients were often prescribed multiple medications and that a pharmacist was needed to screen for drug interactions and to help explain medication side effects.   Dr. Babb has not rebutted these legitimate and non-retaliatory reasons for the removal of her Advanced Scope. The Court thus determines that summary judgment in favor of the VA is warranted with respect to Dr. Babb's retaliation claim for removal of her Advanced Scope.

### b.   Non-Selection for Anticoagulation

Dr. Babb also asserts that she was retaliated against because she was not selected for the anticoagulation position. However, in her own deposition, she remarked that it was the worst interview of her life. (Babb Dep. Doc. # 59 at 115, 124).   She also admitted that she did not have direct experience in administering anticoagulants.   (Id. at 119). These statements speak for themselves.   The VA should not be expected to hire an individual for an open position that interviews poorly, especially when several more qualified individuals apply for the position.

As noted, a panel of three interviewed the candidates in April of 2013. (Doc. # 52-2 at 144).   Panel member Dr. Hall explained: "[s]ince anticoagulation experience was preferred,

but not required, the clinical questions were structured in a manner that would allow a candidate without experience to still answer them correctly and score highly if they had a good understanding of anticoagulation literature and guidelines." (Id. at 140).

Dr. Hall further testified that the "selectees' prior experience indicated to the panel that they should be capable of doing the job in an efficient and skilled manner [and] should require little training to practice independently," in contrast to Dr. Babb who "did not have any direct experience in anticoagulation." (Id.). Dr. Hall also noted that Dr. Babb used derogatory and unprofessional language during the interview – specifically referring to another doctor as "screwed up" and calling her duties "crap." (Id. at 141). Dr. Hall explained that "the anticoagulation position requires a candidate with good communication skills and respect for other medical providers." (Id.).

Another member of the panel, Dr. Sypniewski recalled that the candidates selected "had significantly more experience in the applied for position" and "were better able to answer the questions," while Dr Babb "did not portray the confidence level needed" to treat anticoagulation patients. (Id. at 152-153).   Dr. Stewart likewise testified that Dr. Babb's

experience was "nowhere near the other two who were selected for the position." (Id. at 160).

Dr. Babb has not confronted these reasons for her non-selection "head on." Chapman, 229 F.3d at 1030. Instead, she infers that she was best suited for the position, pointing out that one of the selected doctors, Dr. Grawe, "never had an advanced scope and was not a CPS." (Babb Decl. Doc. # 68-2 at ¶ 23).

Even assuming, arguendo, that Dr. Babb was the superior candidate, she falls short of showing that there was a disparity in qualifications "of such weight and significance" that a reasonable employer could not have chosen Dr. Grawe over Dr. Babb. Kidd v. Mando Am. Corp., 731 F.3d 1196, 1206 (11th Cir. 2013). On this point, the Eleventh Circuit has clarified that the inquiry is not who was a better candidate for the position, but rather whether the discrepancy is "so apparent as virtually to jump off the page and slap you in the face." Cofield v. Goldkist, Inc., 267 F.3d 1264, 1268 (11th Cir. 2001). That is not the case here.

The Court finds that Dr. Babb has not demonstrated that the VA's proffered reasons for not selecting her for the anticoagulation position - two other candidates had a better interview and had more relevant experience - are a pretext for

31

retaliation.   Courts should not be in the business of adjudging whether employment decisions are prudent or fair, but should merely determine whether an unlawful animus motivates a challenged employment decision. See Elrod, 939 F.2d at 1470.  The VA is accordingly granted summary judgment on Dr. Babb's retaliation claim as to her non-selection for the anticoagulation position.

c.  **Refusal to Transfer Dr. Babb to Module B**

Dr. Babb generally asserts that the denial her request for a lateral transfer to Module B was tainted by a retaliatory motive.  However, the evidence shows that the Module B position did not exist at the time Dr. Babb requested to be transferred into Module B. (Doc. # 52-2 at 185). It is true that Dr. Howard had previously suggested that Dr. Babb consider a transfer to Module B in June of 2012, but Dr. Babb dismissed the opportunity because she felt the geriatrics department was her professional calling. (Babb Decl. Doc. # 68-2 at ¶ 10).  It was nine months later that Dr. Babb requested a lateral transfer to Module B.  By that time (and with the implementation of mandatory national standards), the Module B position was not available. The VA was not required to create (or hold open) a position just to accommodate a disgruntled employee such as Dr. Babb.  In addition, the

record shows that a younger employee (Dr. Natalia Schwartz) requested to be transferred into Module B in June of 2012, and Dr. Schwartz was also turned down. (Doc. # 52-2 at 185).

Dr. Babb has not pointed to any evidence of pretext for the denial of her requested transfer.  Instead the record shows that the VA was subject to constant staffing changes, was in the process of conforming with mandatory national guidelines, and (with respect to some clinics) was understaffed and could not meet patient demands.  The VA eventually combined the Module B position with another position and offered it to Dr. Babb, and she accepted (and currently holds that position).  With no evidence of pretext, summary judgment is appropriate as to the denial of a lateral transfer to Module B.

### d. __Dr. Martinez__

Dr. Babb also claims that the VA's alleged retaliation can be seen through the way it treated Dr. Megan Martinez more favorably than Dr. Babb.  Specifically, Dr. Babb asserts that Dr. Martinez was able to retain her Advanced Scope despite moving from one department to the next while Dr. Babb was not given that option.

However, the VA asserts that Dr. Martinez is not a comparator to Dr. Babb because "(1) unlike endocrinology,

33

geriatrics did not ask to be without a pharmacist, (2) Dr. Babb did not already spend half of her time floating in a role that required an Advanced Scope, and (3) when Dr. Babb left geriatrics at her own request, there is no evidence of extended upcoming leaves she could cover." (Doc. # 52 at 25).

In contrast to Dr. Martinez, Dr. Babb was a pharmacist in the geriatrics department and a VA decision maker determined that geriatric patients did not need Disease State Management performed by a pharmacist.  Dr. Babb's Advanced Scope was therefore removed.  Thereafter, Dr. Babb continued to work in the geriatrics clinic and did not (at least at the time after the removal of her Advanced Scope) float from one clinic to the next or cover for employees utilizing maternity leave. Dr. Babb went from performing Disease State Management to not performing Disease State Management due to the removal of Disease State Management from her contract.  In contrast, Dr. Martinez consistently performed Disease State Management in every position she occupied, and did so at least 25% of the time, regardless of her official title.  The legitimate business reason for allowing Dr. Martinez to keep her Advance Scope even though she changed positions has not been called into question by Dr. Babb and there is no evidence of pretext

34

or of retaliation with respect to the VA's treatment of Dr. Martinez vis-a-vis Dr. Babb.

### e. <u>Holiday Pay</u>

Dr. Babb indicates that she works every Saturday. (Babb Decl. Doc. # 68-2 at ¶ 27). She claims that "the loss to me of not getting the Monday Holiday pay has been $2,320 to date." (<u>Id.</u> at ¶ 34). However, Dr. Babb admitted that she already makes more money than someone on a regular Monday through Friday eight hour per day schedule. (Babb Dep. Doc. # 59 at 158). Dr. Babb agreed to her compressed schedule and was provided with all of the relevant information about her pay before accepting the position. (Doc. # 52-3 at 30). She testified that she weighed the pros and cons of the two job offers that the VA presented to her and she accepted the position with the compressed schedule. (Babb Dep. Doc. # 59 at 139).

After Babb complained about her Holiday pay, the VA offered to permanently adjust her schedule such that she would be entitled to eight, rather than four, hours of Holiday premium pay for all Monday federal Holidays, but she refused. (Doc. # 52-3 at 144). As such, Dr. Babb has not created a genuine issue of material fact with respect to her Holiday pay such that a reasonable jury could find in her favor on this

35

issue.  Summary judgment in favor of the VA is accordingly granted on Dr. Babb's retaliation claim for Holiday pay.

### f.  __Denial of Training__

Although denial of training is not alleged as a specific and discrete employment action, Dr. Babb repeatedly references the denial of training throughout her submissions and weaves the denial of training into several of her discrete claims. There are two separate instances of denial of training discussed in the depositions and evidence.  First, Dr. Babb requested permission from Dr. Howard to attend a two day geriatrics training.  Dr. Howard testified that she did not allow Dr. Babb to go to this training because the registration deadline was past: "it means I couldn't register her." (Howard Dep. Doc. # 57 at 35).  In addition, Dr. Babb had patients scheduled during the relevant time. (Id. at 36). Dr. Howard also explained that Dr. Babb did not need the training because she already had a good understanding of the subject matter being presented at the training. (Doc. # 52-3 at 59).

Dr. Babb also requested training in the anticoagulation department, but that training was denied by Dr. Justice. (Justice Dep. Doc. # 55 at 34).  The record reflects that the anticoagulation department was tremendously busy and understaffed.  Dr. Stewart explained that the anticoagulation

department was "overwhelmed with patients." (Stewart Dep. Doc. # 60 at 60).   He recalled one day where the clinic saw approximately 32 patients, but was nevertheless "falling behind" with "20-plus patients left over from yesterday." (Id.).  He testified "there's never enough staff to handle the patient load." (Id. at 65).   In addition, the anticoagulation clinic was responsible for providing training to medical student residents. (Id. at 5).

The reasons stated above for not providing Dr. Babb with certain training opportunities in question are legitimate and non-retaliatory.  Dr. Babb has pointed out that other individuals were provided with special training opportunities, but she has not been able to demonstrate that her requested training was denied as an act of retaliation.

### B.   Count II - Gender and Age Discrimination

Employment discrimination claims all require proof of discriminatory intent. See Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 767 (11th Cir. 2005).  When a Title VII or ADEA plaintiff's claim is based on circumstantial evidence of discrimination, courts apply the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793 (1973). Kidd, 731 F.3d at 1202 (Title VII); Kragor v. Takeda Pharms. Am., Inc., 702 F.3d 1304, 1308 (11th Cir. 2012)(ADEA).

37

Under the McDonnell Douglas framework, a plaintiff must first create an inference of discrimination through her prima facie case. Vessels, 408 F.3d at 767. "Once the plaintiff has made a prima facie case, a rebuttable presumption arises that the employer has acted illegally." Alvarez v. Royal Alt. Devs., Inc., 610 F.3d 1253, 1264 (11th Cir. 2010). "The employer can rebut that presumption by articulating one or more legitimate non-discriminatory reasons for its action." Id. "If it does so, the burden shifts back to the plaintiff to produce evidence that the employer's proffered reasons are a pretext for discrimination." Id.

Here, Dr. Babb maintains that she was discriminated against on the basis of her gender and her age when she was not selected for the anticoagulation position and when she was denied transfer to Module B.  These are some of the same actions by the VA that Dr. Babb contends were acts of retaliation for her protected activity.  The Court's analysis above addresses each challenged employment action and demonstrates how each action was free of an illegal motive. However, to be abundantly thorough, the Court will discuss these issues under the prism of the McDonnell Douglas burden shifting test for age and gender discrimination.

### 1.   Non-Selection for Anticoagulation

In the related <u>Trask</u> case, the Eleventh Circuit held:

> In a typical failure to hire scenario, the plaintiff establishes a prima facie case of unlawful discrimination by demonstrating that: "(1) she was a member of a protected class; (2) she applied and was qualified for a position for which the employer was accepting applications; (3) despite her qualifications, she was not hired; and (4) the position remained open or was filled by another person outside of her protected class."

<u>Trask</u>, 822 F.3d at 1191 (citing <u>EEOC v. Joe's Stone Crabs, Inc.</u>, 296 F.3d 1265, 1273 (11th Cir. 2002)).

Here, Dr. Babb meets these elements. She was a member of a protected class as a woman over the age of forty, she applied for the open anticoagulation position and she was generally qualified. She would not have been interviewed by the panel if she did not meet the minimum qualifications for the position. She was not hired, and the position was filled by two younger female pharmacists.

The burden accordingly shifts to the VA to rebut the inference of age discrimination by presenting a legitimate and non-discriminatory reason for not hiring Dr. Babb for the anticoagulation position at that juncture. <u>Holifield v. Reno</u>, 115 F.3d 1555, 1564 (11th Cir. 1997). This burden is "exceedingly light" and the VA need only produce evidence that could allow a rational juror to conclude that the challenged employment action was not made for a discriminatory reason.

Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1061 (11th Cir. 1994).  The VA has met this burden with evidence that the three panel members who conducted the interviews for the anticoagulation position agreed that Dr. Mack and Dr. Grawe were the best of the four candidates. (Doc. # 52-2 at 139).

As noted, Dr. Hall testified that the "selectees' prior experience indicated to the panel that they should be capable of doing the job in an efficient and skilled manner [and] should require little training to practice independently," in contrast to Dr. Babb who "did not have any direct experience in anticoagulation." (Id. at 140).  Likewise, Dr. Sypniewski explained that the selected candidates:

> Had significantly more experience in the applied for position.  They had either done residencies where they were required to work in anti-coag clinic, or they actually already were processing anti-coag consults, or they had actually worked in anti-coag clinic post-residency.  They knew and were familiar with the workings of the position to which they had applied, and their experience in anti-coag enabled them to answer the questions with examples.

(Id. at 152).  In comparison, Dr. Sypniewski remembered that Dr. Babb appeared nervous at her interview, and did not answer the panel's questions with "specific examples." (Id. at 153).

Finding that Dr. Babb was less qualified for the position than the two younger pharmacists that were hired is a

40

legitimate and non-discriminatory reason for the VA's hiring decision.  The burden accordingly returns to Dr. Babb to supply evidence "sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." <u>Davis v. Qualico Miscellaneous, Inc.</u>, 161 F. Supp. 2d at 1322 (citing <u>Chapman</u>, 229 F.3d at 1024).

Dr. Babb points out that she was eventually offered a position that included anticoagulation and argues that she could not have been that poor of a candidate or she would not have been offered a position involving administering anticoagulants.  (Babb Decl. Doc. # 68-2 at ¶ 27).  This argument misses the point.  The VA has not argued that Dr. Babb's non-selection in 2013 was based on complete incompetence or a consideration that would have barred her from all anticoagulation positions indefinitely.  Rather, at the time of the relevant interview, two other candidates with more experience applied and Dr. Babb admittedly interviewed poorly.  The VA selected the two pharmacists for the anticoagulation position that had the most experience and who interviewed well.

As stated in <u>Alexander v. Fulton County</u>, 207 F.3d 1303, 1341 (11th Cir. 2000), "it is not the court's role to second-

41

guess the wisdom of an employer's decision." Furthermore, the Court does not "sit as a super-personnel department that reexamines" hiring decisions. <u>Davis</u>, 245 F.3d at 1244. Accordingly, Dr. Babb has not shown that the VA's proffered reason for its hiring decision is unworthy of credence, and the VA is entitled to summary judgment on this issue.

## 2.  **Denial of Transfer to Module B**

Dr. Babb claims that she was discriminated against because her request to be laterally transferred to Module B was denied by Dr. Justice.  To establish a prima facie case of disparate treatment in an employment discrimination case, the plaintiff must show "(1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job." <u>Trask</u>, 822 F.3d at 1192 (citing <u>Burke-Fowler v. Orange Cty.</u>, 447 F.3d 1319, 1323 (11th Cir. 2006)).

Dr. Babb does not have a prima facie case for gender or age discrimination because she has not identified a comparator that was treated more favorably than her with respect to a lateral transfer.  In <u>Trask</u>, the court explained: "[w]ith respect to the third prong of the prima facie case, the

42

plaintiffs and the employee they identify as a comparator must be similarly situated in all relevant respects. The comparator must be nearly identical to the plaintiffs to prevent courts from second-guessing a reasonable decision by the employer." Trask, 822 F.3d at 1192 (internal citation and quotation marks omitted). In order for Dr. Babb to establish a prima facie case of disparate treatment, she must show that a similarly-situated person outside of her protected class sought a lateral transfer to Module B (or another location) and was granted such a transfer under like circumstances. Id.

It is not an easy task to ascertain the identity of Dr. Babb's purported comparator. In her response to the Motion for Summary Judgment, she indicates: "there are comparators for all of the events. In some instances those comparators are young females; in others young males; in others older males and in still others a combination of all three or two of those categories. However, in each instance, older females are being treated adversely." (Doc. # 68 at 27).

Dr. Babb did not come forward with a specific comparator that was treated more favorably than her. In fact, the record shows that a younger female, Dr. Natalia Schwartz, sought to be transferred into the Module B department and was also turned down. Dr. Babb has not shown that a pharmacist outside

of her protected class was transferred into Module B (or any other department) in order to be eligible for a GS-13 upgrade. The lack of a comparator is fatal to Dr. Babb's prima face case for discrimination.  And, even if Dr. Babb was able to assert such a prima facie case, the VA has come forward with a legitimate and non-discriminatory reason for denying Dr. Babb's request to be transferred into Module B – that position was no longer available at the time that Dr. Babb requested the transfer. The Court accordingly determines that the VA is entitled to summary judgment on Dr. Babb's discrimination claim.

### 3.   Dr. Babb's Case under the Smith Mosaic Test

Dr. Babb contends in her response to the Motion for Summary Judgment that her discrimination claims survive under the "convincing mosaic" test articulated in Smith v. Lockheed Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). There, the Eleventh Circuit explained that regardless of the outcome of the McDonnell Douglas burden-shifting analysis, "the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Id. at 1328. A triable issue of fact exists if, when viewed in the light most favoable to the plaintiff, the record shows "a convincing

mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." <u>Smith</u>, 644 F.3d at 1328; <u>see also</u> <u>Sims v. MVM, Inc.</u>, 704 F.3d 1327, 1333 (11th Cir. 2013)(applying convincing mosaic test in ADEA case).

In <u>Smith</u>, the plaintiff failed to establish a prima facie case of race discrimination but the plaintiff presented evidence that the employer identified its employees by race, that all white employees under investigation were fired, and no black employees under investigation were terminated.  In contrast, viewing the evidence in the light most favorable to Dr. Babb, the Court determines that there is not a convincing mosaic of circumstantial evidence showing discrimination.

## C. **Count III - Hostile Work Environment**

Dr. Babb also asserts that she was subjected to an actionably hostile work environment based on age, gender, and retaliation for protected activity.  In order to establish a hostile work environment under Title VII, a plaintiff must demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment." <u>Gowski v. Peake</u>, 682 F.3d 1299, 1311 (11th Cir. 2012).

45

To support a hostile work environment based on age or gender, Dr. Babb must prove:

> (1) he or she belonged to a protected group, (2) he or she was subjected to unwelcome harassment, (3) the harassment was based on a protected characteristic, (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of his or her employment and create an abusive working environment, and (5) a basis exists for holding the employer liable.

Trask, 822 F.3d at 1195 (citing Gupta v. Florida Bd. of Regents, 212 F.3d 571, 582 (11th Cir. 2000)).

To support a retaliatory hostile work environment claim, Dr. Babb must establish that she engaged in protected activity, she was subject to unwelcome harassment, the harassment was based on protected activity, and the harassment was sufficiently severe or pervasive to alter the terms, conditions, or privileges of employment. Gowski, 682 F.3d at 1311-12.

"It is a bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII." Jones v. UPS Ground Freight, 683 F.3d 1283, 1297 (11th Cir. 2012)(quotation marks omitted). "Therefore, only conduct that is based on a protected category [or protected activity] may be considered in a hostile work environment analysis." Id. "[T]he Courts of Appeals have uniformly observed that Title

46

VII is not a civility code, and that harassment must discriminate on the basis of a protected characteristic in order to be actionable." Reeves v. C.H. Robinson Worldwide, Inc., 594 F. 3d 798, 809 n.3 (11th Cir. 2010).  As explained in Jones, 683 F.3d at 1297, "Innocuous statements or conduct, or boorish ones that do not relate to [age, gender, or protected activity] . . . are not counted."

"The requirement that the harassment be severe or pervasive contains an objective and a subjective component." Gowski, 682 F.3d at 1312.  In considering the objective severity of alleged harassment, the Court looks at the totality of the circumstances and considers (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating (or a mere offensive utterance), and (4) whether the conduct unreasonably interferes with the employee's job performance. Id. In Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998), the Court admonished: "we have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." Id.

Throughout Dr. Babb's deposition, she repeatedly expressed the sentiment that she was subjected to a hostile work environment. (Babb Dep. Doc. # 59 at 13, 15, 39, 57, 68,

47

81, 112, 122, 138, 143, 157, 185).  However, when she actually recounted the specific instances that she felt were harassment, the Court finds that no reasonable jury could determine that Dr. Babb was subjected to a hostile work environment.  As for age, gender, or protected activity-related remarks, Dr. Babb recalls that Dr. Howard asked when Dr. Babb planned to retire, and Dr. Justice remarked that the film "Magic Mike" was geared toward middle aged females and also called Dr. Babb a "mow mow" (a made up term used to describe a frequent complainer).  These sporadic and non-threatening remarks, as well as the litany of grievances Dr. Babb describes in her submissions ("fully successful" instead of "excellent" evaluation, being called to testify about the "vulgar letter," denial of training, reports of contact addressed to Dr. Stewart, and other tribulations) do not create a hostile work environment as a matter of law.

Dr. Babb has described feeling upset, crestfallen, and dismayed due to the VA's employment practices (Babb Decl. Doc. # 68-2); however, she has not described an objectively hostile working environment "filled with intimidation and ridicule that was sufficiently severe or pervasive to alter the plaintiff's working conditions." Gowski, 682 F.3d at 1313. Rather, Dr. Babb has described "the ordinary tribulations of

the workplace," which do not constitute actionable harassment. <u>Gupta</u>, 212 F.3d at 586; <u>see</u> <u>also</u> <u>Baroudi</u>, 616 Fed. Appx. at 905 (actions that "upset" and "humiliated" the plaintiff, including cancellation of her clinic, removal of papers from her office, and general incivility, did not constitute a retaliatory hostile work environment as a matter of law); <u>Trask</u>, 822 F.3d at 1196 ("pharmacy management behaved rudely and made comments that plaintiffs considered offensive, belittling, and humiliating," but those actions did not constitute a hostile work environment based on age and gender.) After due consideration, the Court grants the VA's Motion for Summary Judgment as to Dr. Babb's hostile work environment claim.

## IV. **Conclusion**

The existence of a mere scintilla of evidence in support of a non-moving party's position is insufficient; the test is "whether there is [evidence] upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." <u>Anderson</u>, 477 U.S. at 252. A party opposing summary judgment must "show specific facts exist that raise a genuine issue for trial." <u>Dietz v. SmithKline Beecham Corp.</u>, 598 F.3d 812, 815 (11th Cir. 2010). "Mere conclusions and unsupported factual allegations are

49

legally insufficient to create a dispute to defeat summary judgment." <u>Bald Mountain Park, Ltd. v. Oliver</u>, 863 F.2d 1560, 1563 (11th Cir. 1989).   "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." <u>Saltzman v. Bd. of Comm'rs of the N. Broward Hosp. Dist.</u>, 239 Fed. Appx. 484, 487 (11th Cir 2007).

Dr. Babb, confronted with the VA's properly supported Motion for Summary Judgment, has not met her burden because she has not shown that specific facts exist that raise a genuine issue for trial and has not supported her conclusional allegations with an evidentiary foundation.   For this reason, and for the reasons articulated above, the Court grants the VA's Motion for Summary Judgment.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Defendant the Secretary of Veterans Affairs' Motion for Summary Judgment (Doc. # 52) is **GRANTED.**

(2)   The Clerk is directed to enter Judgment in favor of Defendant the Secretary of Veterans Affairs and thereafter to **CLOSE THE CASE.**

50

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>23rd</u>

day of August, 2016.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE