[DO NOT PUBLISH]

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

_____

No. 16-16492

_____

D.C. Docket No. 8:14-cv-01732-VMC-TBM

NORIS BABB,

Plaintiff - Appellant,

versus

SECRETARY, DEPARTMENT OF VETERANS AFFAIRS,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 16, 2018)

Before ED CARNES, Chief Judge, NEWSOM and SILER,[*] Circuit Judges.

PER CURIAM:

_____

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

This appeal arises from an employment-discrimination action filed by Dr. Noris Babb, a pharmacist at the C.W. "Bill" Young VA Medical Center in Bay Pines, Florida, against the Secretary of the Department of Veterans Affairs.  Babb alleges that her managers discriminated against her based on her gender and age, retaliated against her because she had engaged in protected EEOC activity, and subjected her to a hostile work environment—all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § § 621 *et seq*.  Babb appeals from the district court's grant of summary judgment in favor of the Secretary.

Babb raises three issues on appeal.  First, she contends that the district court erred by applying the *McDonnell Douglas* standard[1] rather than the more lenient "motivating factor" test to her gender- and age-discrimination and retaliation claims.  Second, she asserts that the district court overlooked genuine issues of material fact concerning intent and pretext.  And finally, she argues that the district court erroneously granted summary judgment on her hostile-work-environment claim.

Having considered the parties' written briefs and oral arguments, we affirm the district court's grant of summary judgment on Babb's ADEA claim, her Title

---

[1] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

VII retaliation claim, and her hostile-work-environment claim.  We reverse the district court's grant of summary judgment on Babb's gender-discrimination claim and remand for consideration under the motivating-factor standard.

## I

The facts here are complex—or at least unwieldy.  For the sake of clarity, we divide our summary into three parts: (a) a description of Babb's employment and responsibilities in the years leading up to her (and others') complaints about alleged gender and age discrimination; (b) a brief description of those complaints; and (c) a slightly more extended description of the actions that Babb contends constituted unlawful discrimination and/or retaliation, as well as the Secretary's asserted reasons for those actions.

## A

Babb, a clinical pharmacist, joined the Medical Center in 2004.  As a clinical pharmacist, Babb worked under the auspices of the Medical Center's Pharmacy Services division.  In 2006, Babb accepted a position as a geriatrics pharmacist. Between 2006 and June 2013, Babb was assigned to an "interdisciplinary team" of caregivers in the Medical Center's Geriatric Clinic.  Accordingly, Babb's work scope and responsibilities were governed by a service agreement between Pharmacy Services and Geriatric.  As a clinical pharmacist working in the Geriatric Clinic, Babb was supervised both by Dr. Leonard Williams, Chief of the Geriatric

Clinic, and by Pharmacy Services administrators—Dr. Marjorie Howard, Babb's

direct Pharmacy Services supervisor; Dr. Keri Justice, Associate Chief of

Pharmacy; and  Dr. Robert Stewart, the Clinical Pharmacy Supervisor.

In 2009, while a member of the interdisciplinary team, Babb obtained an

"advanced scope of practice," which meant that she could practice "disease state

management" (or "DSM")—*i.e.*, she could see patients and prescribe medication

for conditions within the scope of her expertise without consulting a physician.

In 2010, the VA announced a nationwide initiative called "Patient Aligned

Care Team" (or "PACT"), which triggered staffing changes at the Medical Center.

As part of the PACT initiative, the VA established qualifications standards

pursuant to which pharmacists spending at least 25% of their time practicing DSM

would be eligible for promotion to GS-13.    Because she had an advanced scope

that enabled her to practice DSM, Babb sought a promotion.

**B**

Along the way, Babb and some of her colleagues concluded that Pharmacy

Services was implementing the new qualifications standards in a way that evinced

gender and age discrimination.  Two other clinical pharmacists at the Medical

Center, Drs. Donna Trask and Anita Truitt, filed EEO complaints in September

2011.  In April and May 2012, Babb sent emails supporting Trask and Truitt to an

EEOC investigator, and later, in March 2014, Babb gave a deposition in support of

Trask and Truitt.  Babb also advocated on her own behalf; in a February 2013 conversation with Dr. Justice, Babb says that she identified herself as "another over 40 female with a grievance" and complained about management's decision (of which more below) not to have her practice DSM anymore.  In May 2013, Babb filed the EEOC complaint that ultimately led to this suit.

C

In the fall of 2012, Pharmacy Services and Geriatric began renegotiating the services agreement governing Babb's responsibilities.  Babb asked a Pharmacy Services supervisor whether she should "do anything" about the negotiations, but was told that they would be "taken care of at the Service Chief level and [that she] didn't need to be concerned about it."  Babb later found out that two younger pharmacists—Drs. Lindsey Childs and William Lavinghousez—did participate in the service-agreement negotiations; Pharmacy Services explained that both were infectious-disease specialists and that its representative was unfamiliar with infectious-disease treatment protocol and so needed their input.

Pharmacy Services and Geriatric finalized the new service agreement governing Babb's responsibilities in December 2012.  While they considered having Babb remain in the Geriatric Clinic, keep her advanced scope, and spend at least 25% of her time practicing DSM, they ultimately concluded that such a solution was unworkable.  In particular, although Dr. Williams wanted to keep

5

Babb in the Geriatric Clinic, he thought that reserving 25% of her time for DSM posed two problems: (1) he feared that it would detract from her role as a clinical pharmacist and patient caregiver and increase wait times for geriatric patients; and (2) he did not think that the DSM model was particularly well suited to geriatric patients.  Accordingly, Williams determined that the Geriatric Clinic could not afford to allow Babb to devote more than three "slots" per day to DSM.  Those three slots would equate to only about 18.75% of Babb's time, well short of the 25% required for promotion under the new PACT-based standards.  When it became clear that Geriatric would not agree to an arrangement that would permit Babb to meet the necessary 25% DSM threshold, Pharmacy Services and Geriatric agreed that Babb would not have any scheduled DSM responsibilities but would instead perform all of her work as part of an integrated patient-care team.

Because Babb would no longer practice DSM under the new service agreement, she would not need an advanced scope.  Accordingly, shortly after the new service agreement was finalized, Pharmacy Services management began the process of removing Babb's advanced-scope designation.

During this same time period, Babb sought opportunities in the Medical Center's anticoagulation clinic.  Initially in the fall of 2012, and then again in January 2013, Babb requested anticoagulation training so that she could help out in the anticoagulation clinic.  Pharmacy Services denied both requests on the grounds

that the clinic was responsible for training medical residents, that the clinic was understaffed and lacked the capacity to train additional people, and that the training was unrelated to Babb's work as a clinical pharmacist in the Geriatric Clinic.

Separately, in April 2013, Babb applied for two open positions in the anticoagulation clinic. A three-member panel conducted interviews for the positions and ultimately selected two younger female pharmacists. The interviewers explained that the two selected candidates had more anticoagulation experience than Babb (who had none) and that Babb had used unprofessional language and criticized other Medical Center employees during her interview. Babb herself characterized the interview as "the worst interview of [her] life."

That same month, Pharmacy Services convened an administrative investigation board ("AIB") to investigate a vulgar letter received by Dr. Gary Wilson, Chief of Pharmacy Services. The letter discussed concern over promotion practices in pharmacy between GS-11 and GS-13. During the AIB's investigation, Justice testified that Babb had been part of a group of pharmacists known as "mow-mows" or "squeaky wheels" who were "never happy, always complaining," and that certain employees perceived that "they were [being] discriminated against because they were older and female." Wilson testified that he believed that Babb had "felt that [she was being] discriminated against over age and sex." The AIB

questioned a total of 26 employees; Babb was "really upset" about being one of those questioned.

When Babb learned that she had not been selected for either of the anticoagulation positions for which she had interviewed, she filed the EEOC complaint that led to this suit in May 2013. She also requested that she be moved out of the Geriatric Clinic and into the "float pool," where she would cover for absent staff in a variety of areas. Babb's position as a floater did not require an advanced scope and did not present promotion opportunities. Pharmacy Services approved Babb's request. Soon after Babb began floating in July 2013, Babb's supervisor received two complaints about Babb that had been filed by one of Babb's coworkers. The first asserted that Babb had been rude to a patient, the second that Babb had failed to answer her pager. Babb's supervisor talked to her about the complaints, and Pharmacy Services management knew about them, but they did not result in any discipline and did not affect Babb's performance appraisal. Babb enjoyed her time in the float pool.

In early 2014, Babb applied for and was promoted to a PACT position that involved work in the hospital's Module B and Module D. The announcement that advertised the job opening read as follows: "Four 9 hour shifts Tuesday through Friday 7:00 am – 4:30 pm with a 4 hour shift Saturday 8:00 am-12:00pm. Nights, weekends and holiday[s] on a fair and equitable rotational schedule." In April

2014, Justice submitted paperwork to facilitate Babb's promotion; she marked "excellent" on all applicable forms and remarked that Babb was "an excellent practitioner with a broad knowledge of clinical pharmacy" and "great with patients!" The VA approved Babb's promotion to GS-13 in August 2014. After starting her new job, Babb learned that she was entitled to only four hours of holiday pay for each of the five Monday federal holidays. (A traditional schedule with five eight-hour weekday shifts would provide eight hours of holiday pay for each Monday holiday. ) Babb was "very upset" and said that she would not have taken the job if she had known about the holiday-pay issue. The Medical Center offered to change Babb's schedule, but she declined; she testified that due to the additional pay she gets for working on Saturdays, she makes more money than employees who work eight hours a day Monday through Friday.

## II

Babb sued the Secretary of the Department of Veterans Affairs in July 2014. In her complaint, Babb claimed that her managers discriminated against her based on her gender and age, retaliated against her because she had engaged in protected EEOC activity, and subjected her to a hostile work environment—all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § § 621 *et seq.*

9

The Secretary filed a motion for summary judgment, which the district court granted. The court analyzed the gender- and age-discrimination claims, as well as the retaliation claim, under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). With respect to each of the claims, the court found (1) that Babb had established a prima facie case, (2) that the Secretary had proffered legitimate, nondiscriminatory, non-retaliatory reasons for the challenged employment actions, and (3) that no jury could reasonably conclude that those reasons were pretextual. On Babb's hostile-work-environment claim, the court held that the remarks about which Babb complained were not sufficiently severe and pervasive to create an objectively abusive working environment.

## III

## A

Babb first contends that the district court erred by applying the *McDonnell Douglas* test, rather than the more lenient motivating-factor test, to her "mixed-motive" Title VII gender-discrimination claim.[2] We agree.

---

[2] Unlike a "single-motive" claim (sometimes called a "pretext" claim), in which the plaintiff alleges that unlawful discrimination was "the true reason" for an adverse employment action, *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016), a mixed-motive plaintiff need only allege that discrimination was "a motivating factor" for the employer's action, 42 U.S.C. § 2000e-2; *see also Quigg*, 814 F.3d at 1235.

In *Quigg v. Thomas County School District*, we held that a plaintiff alleging a mixed-motive Title VII discrimination claim need not satisfy *McDonnell Douglas*'s "overly burdensome" standard. 814 F.3d 1227, 1237 (11th Cir. 2016). Instead, we concluded that a plaintiff need only offer "evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was *a motivating factor* for the defendant's adverse employment action." *Id*. at 1239 (emphasis added) (internal quotation marks omitted). Gender discrimination constitutes a motivating factor if it "factored into [the employer's] decisional process." *Id*. at 1241.

The Secretary does not dispute that *Quigg*'s motivating-factor standard applies to Babb's mixed-motive gender-discrimination claim. Nor does the Secretary dispute that the district court failed to apply *Quigg*'s standard and evaluated Babb's claim under *McDonnell Douglas* instead. The Secretary asserts, however, that Babb waived her mixed-motive claim by failing to allege it specifically in her complaint. We disagree. As a plurality of the Supreme Court explained in *Price Waterhouse v. Hopkins*, a plaintiff should not be required to label her complaint "as either a 'pretext' case or a 'mixed-motives' case from the beginning in the District Court" because "[d]iscovery often will be necessary before the plaintiff can know whether both legitimate and illegitimate considerations played a part in the decision against her." 490 U.S. 228, 247 n.12

11

(1989).  Here, Babb sufficiently raised her mixed-motive theory in the district

court by arguing it in response to the Secretary's summary judgment motion.

Rather than determine for ourselves whether Babb's evidence meets *Quigg*'s

motivating-factor standard, we think it more prudent to remand Babb's gender-

discrimination claim to the district court for consideration under the proper test in

the first instance.[3]

**B**

Babb next contends that the district court erred in applying the *McDonnell*

*Douglas* framework, rather than the motivating-factor test, to her ADEA age-

discrimination claim.  If we were writing on a clean slate, we might well agree.  It

is true, as the Secretary says, that the Supreme Court held in *Gross v. FBL*

*Financial Services, Inc*., 557 U.S. 167 (2009), that the provision of the ADEA

applicable to private-sector employees precludes application of a motivating-factor

standard.  In so holding, the Court hewed closely to that provision's particular text:

---

[3] Because we are remanding for reconsideration under the proper motivating-factor standard, we
should clarify one thing about the district court's decision.  In the course of rejecting Babb's
gender- and age-discrimination claims, the court wrote that "the analysis above"—by which it
meant its examination of Babb's separate retaliation claim—"demonstrates how each action was
free of an illegal motive."  In isolation, that "free of an illegal motive" phrase could be
interpreted to mean that Babb's evidence would fail even a motivating-factor analysis.  But given
that "the analysis above" to which the district court was pointing focused, under *McDonnell*
*Douglas*, on the question whether Babb had demonstrated pretext—an analysis that *Quigg* held is
"fatally inconsistent with the mixed-motive theory of discrimination," 814 F.3d at 1237—we are
reluctant to read the district court's brief remark for all it might possibly be worth.  If the district
court in fact meant to articulate a finding that would satisfy even the motivating-factor standard,
then it may say so on remand.

"It shall be unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's age." *Id*. at 176 (quoting 29 U.S.C. § 623(a)(1)) (emphasis added in *Gross*). As the Court's italics indicate, it focused on the phrase "because of"— which, the Court held, requires an age-discrimination plaintiff to prove "that age was the 'reason' that the employer decided to act," *i.e.*, "the 'but-for' cause of the employer's adverse decision." *Id*.

As Babb has pointed out here, the provision of the ADEA that governs discrimination claims brought by *federal*-sector employees reads differently. In pertinent part, and with exceptions not relevant here, it states that "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age *shall be made free from any discrimination based on age*." 29 U.S.C. § 633a(a) (emphasis added). Babb contends that the federal-sector provision's particular framing—which, quite unlike the private-sector provision, requires that employment decisions be made "free from any discrimination" based on age— counsels a different result here than in *Gross*, and should be read to embody a motivating-factor (rather than but-for) causation standard. Although Babb's argument is not insubstantial, it is foreclosed by our existing precedent.

13

In *Trask v. Secretary, Department of Veterans Affairs*, this Court applied the

*McDonnell Douglas* standard to an ADEA claim brought by two federal-

government employees—indeed, two employees who worked at the same facility

where Babb worked and made many of the same allegations that Babb has made

here.  822 F.3d 1179, 1191 (11th Cir. 2016).  Under the prior-panel-precedent rule,

*Trask* is binding on us.  *See, e.g.*, *Breslow v. Wells Fargo Bank,* 755 F.3d 1265,

1267 (11th Cir. 2014) ("It is the firmly established rule of this Circuit that each

succeeding panel is bound by the holding of the first panel to address an issue of

law, unless and until that holding is overruled en banc, or by the Supreme Court.").

It is true, as Babb says, that the panel in *Trask* did not analyze the linguistic

differences between the ADEA's private- and federal-sector provisions—

differences that she claims make all the difference.  Even so, we have long—and

consistently, and forcefully—rejected an "overlooked reason" (or "overlooked

argument") exception to the prior-precedent rule.  *See, e.g.*, *Smith v. GTE Corp.*,

236 F.3d 1292, 1302–03 (11th Cir. 2001).

Accordingly, under *Trask*, the district court did not err in applying the

*McDonnell Douglas* test to Babb's ADEA age-discrimination claim.  And under

that standard, we can find no reversible error in the district court's decision.  In

particular, we hold that the district court correctly concluded that Babb failed to

demonstrate that the Medical Center's proffered reasons for the adverse

employment decisions that she alleges were pretextual and that the "real" reason
for those decisions was because Babb was too old.  There are four primary adverse
employment decisions that Babb says were made against her because of her age:
(1) removal of her advanced scope; (2) non-selection for anticoagulation; (3) denial
of training opportunities; and (4) provision of only four hours of holiday pay under
her new Module B schedule.  We consider each in turn.

Addressing Babb's claim that her advanced scope was removed for
discriminatory reasons, the Secretary proffered testimony from Dr. Williams, the
decision-maker who removed Babb's advanced-scope designation, explaining a
nondiscriminatory reason for the decision.  Williams testified that he decided that
Babb would no longer practice DSM—thereby eliminating her need for an
advanced scope—because geriatric patients presented such complex medical cases
that it would be in patients' best interest for care to be provided by
interdisciplinary medical teams rather than by independent pharmacists practicing
DSM.  Babb quarrels with Williams' choice to remove DSM from her schedule in
the Geriatric Clinic, but her arguments reduce to criticism of Williams' business
judgment.  Under the *McDonnell Douglas* framework, to successfully rebut an
employer's proffered nondiscriminatory reason for making a business decision, a
plaintiff must "meet that reason head on and rebut it, and the employee cannot
succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI*

*Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). Here, Babb fails to tackle Williams' proffered nondiscriminatory reason "head on" to prove that a choice to provide interdisciplinary care to frail geriatric patients is not, in fact, what motivated Williams' decision.

Addressing Babb's non-selection for the anticoagulation position, Babb argues that age discrimination underlay the Medical Center's hiring of two younger pharmacists. The Secretary offered evidence of the Medical Center's nondiscriminatory reasons: (1) that the selected pharmacists were more experienced than Babb and (2) that Babb performed poorly in her interview, offering inadequate answers to medical questions and making disparaging remarks about coworkers. Babb does not meaningfully contest the Secretary's assessment that she interviewed poorly for the anticoagulation position; in fact, she acknowledged that her interview was the worst of her life. Babb does contest the conclusion that she was less qualified for the positions than the chosen pharmacists. But while it may be (as Babb argues) that her experience was *different* from the selected pharmacists', it was not necessarily *better* than theirs. The fact is that the hired pharmacists had anticoagulation experience that Babb lacked, and a reasonable employer could rely on that particular experience in making an anticoagulation hiring decision, as the Secretary contends occurred here. Babb has failed to prove that that the Secretary's proffered explanations for

16

her non-selection are pretextual and that age discrimination is the real reason she was passed over.

Addressing Babb's assertion that she was unlawfully denied access to training opportunities, the Secretary offers testimony from Dr. Howard and Dr. Stewart to explain nondiscriminatory reasons for those denials.  Dr. Howard testified that she denied Babb's request to attend a two-day geriatrics training because (1) the registration deadline had passed by the time Babb requested permission to attend the training, (2) Babb was responsible for caring for patients in the Geriatric Clinic at the time of the training, and (3) Howard believed that Babb already possessed a good understanding of the subject matter being taught at the training.  Dr. Stewart testified that at the time Babb's request for anticoagulation training was denied, the anticoagulation department was busy, understaffed, and already burdened with the responsibility of training medical residents.  Babb attempts to demonstrate that these proffered nondiscriminatory reasons for denials of training are pretextual by pointing out other individuals at the Medical Center who were provided with special training opportunities, but the fact that other individuals received some special training does not prove that the real reason that Babb's requested training was denied was discriminatory—*i.e.*, it does not meet the Secretary's explanation "head on."

Finally, addressing Babb's claim regarding discrimination in the administration of holiday pay in her Module B position, the Secretary has explained that holiday pay is tied to Babb's Module B schedule. Babb is scheduled to work nine-hour shifts Tuesday through Friday with a four-hour shift every Saturday; because Babb is never scheduled to work on a Monday, her Monday holiday pay is calculated by referencing back to her most recent work day, a four-hour Saturday shift. Babb admitted that she earned more money on her Tuesday-Saturday schedule (even with her holiday pay complaints) than she would have earned on a traditional Monday-Friday schedule with eight hours of holiday pay for each Monday holiday. When Babb complained about her holiday pay, the VA offered to permanently move her to a traditional Monday-Friday schedule that would entitle her to eight hours of holiday pay for each Monday holiday, but Babb refused the offer. Babb has failed to rebut the Secretary's nondiscriminatory explanation for Babb's holiday pay—namely, that it was calculated in relation to her Tuesday-Saturday schedule.

The Secretary has provided nondiscriminatory reasons for adverse employment decisions about which Babb has complained. Babb has failed to adequately rebut those nondiscriminatory reasons—to meet them "head on"— and prove that they are pretextual. Thus, under *McDonnell Douglas*, we affirm the district court's order of summary judgment on Babb's age discrimination claim.

**C**

Babb similarly asserts that the district court erred in applying *McDonnell Douglas*—again, rather than the motivating-factor test—to her retaliation claim. And again, if we were starting from scratch, we might agree. But again, we are not, and so we cannot.

In *University of Texas Southwest Medical Center v. Nassar*, 570 U.S. 338 (2013), the Supreme Court held (following the rationale of its earlier decision in *Gross*) that Title VII's private-sector retaliation provision requires a but-for, rather than motivating-factor, causation standard. As it had done in *Gross*, the Court emphasized the provision's use of the phrase "because"—in particular, its prohibition of any discrimination "because" an employee has engaged in protected EEO activity. *See id*. at 352 (quoting 42 U.S.C. § 2000e-3(a)). "Given the lack of any meaningful textual difference between the text in this statute and the one in *Gross*," the Court held, "the proper conclusion here, as in *Gross*, is that Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Id*.

But, Babb asserts—as she does in connection with her ADEA claim—the language of Title VII's federal-sector anti-retaliation provision is different. Almost exactly like its ADEA analogue, it states that personnel decisions (again, with exceptions not relevant here) "shall be made free from any discrimination based on

… sex ….” 42 U.S.C. § 2000e-16(a).  Babb insists that the absence of the "because" language that drove the result in *Nassar*, combined with the presence of the broad phrase "free from any discrimination," requires application of a motivating-factor, rather than but-for, causation standard.

Again, though, our earlier decision in *Trask* stands in Babb's way.  There, citing both Title VII's private-sector anti-retaliation provision and *Nassar*, we held—again, in a case involving federal-government employees—that the *McDonnell Douglas* test and a but-for causation standard applied.  And for reasons already explained, it is no answer to *Trask* that the panel there did not engage the linguistic differences between the private- and federal-sector anti-retaliation provisions.  We are bound just the same.

Accordingly, we are constrained to hold that the district court did not err in applying the *McDonnell Douglas* framework to Babb's retaliation claim.  And under that standard, we cannot say that the district court was wrong to grant summary judgment to the Secretary.  In particular, we hold that the district court correctly concluded that Babb failed to demonstrate that the Medical Center's proffered reasons for the adverse employment decisions that she alleges were pretextual and that those decisions were actually motivated by retaliatory animus.[4]

---

[4] In connection with one aspect of her discrimination and retaliation claims, Babb argues—in a single page at the end of her brief—that the district court applied the wrong legal standard.

Babb points to the same adverse employment actions in her retaliation claims as she did in her age discrimination claims.  As explained above—and for the same reasons—Babb has failed to demonstrate that the Secretary's proffered nondiscriminatory reasons for making each employment decision were pretextual.  Just as Babb's age discrimination claims fail because Babb has failed to show that the Secretary's nondiscriminatory reason for the action was pretextual, Babb's retaliation claims similarly fail.  We affirm the district court's order of summary judgment in favor of the Secretary on Babb's retaliation claims.

## D

Finally, Babb claims that the district court erred in granting summary judgment for the Secretary on her hostile-work-environment claim.  We disagree; summary judgment was proper.

---

Specifically, in rejecting Babb's argument that she had established pretext based, in part, on the superiority of her own qualifications for an anticoagulation position vis-à-vis those of the two individuals who were ultimately hired, the district court referred to a since-rejected colloquialism—"that the inquiry is not who was a better candidate for the position, but rather whether the discrepancy is 'so apparent as to virtually jump off the page and slap you in the face.'"  DE 83 at 31 (quoting *Cofield v. Goldkist, Inc*., 267 F.3d 1264, 1268 (11th Cir. 2001)); *see also Ash v. Tyson Foods, Inc*., 546 U.S. 454, 456–57 (2006) (rejecting the "slap you in the face" standard as "imprecise" and "unhelpful").  Here, though, the district court also (and more precisely and helpfully) described Babb's argument as being "that a reasonable employer could not have chosen" either of the other two individuals over her—a standard that the Supreme Court seems to have blessed, *see Ash*, 546 U.S. at 457, and that we have since approved and applied, *see Kidd v. Mando American Corp*., 731 F.3d 1196, 1206 (11th Cir. 2013).  Babb does not dispute the validity of the "reasonable employer" standard, nor does she deny (1) that the selected candidates scored highest during the interview for the anticoagulation position, (2) that she used coarse language and criticized other providers during the interview, or (3) that the interview, by her own admission, was "the worst interview of [her] life."  Under the circumstances, we think it clear that the district court's error, if any, was harmless.

"A hostile work environment claim under Title VII is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). "In evaluating the objective severity of the harassment, this court looks at the totality of the circumstances and considers, among other things: (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with employee's job performance." *Gowski v. Peake*, 682 F.3d 1299,1312 (11th Cir. 2012). The district court here correctly concluded that Babb failed to allege an objectively hostile environment so filled with intimidation and ridicule that it was sufficiently severe or pervasive to alter her working conditions. *Id.* at 1313.

In support of her hostile-work-environment claim, Babb points to many of the same pieces of evidence that she invokes in connection with her discrimination and retaliation claims—*e.g.*, the removal of her advanced scope, the denial of her request for anticoagulation training, the fact that she was not hired for the anticoagulation position for which she applied. In addition, she points to three remarks made to her that, she says, pertained to her age, gender, or protected activity: (1) one pharmacy administrator once asked her, "When do you retire?";

22

(2) another once referred to "Magic Mike" as a "middle-aged woman movie" while speaking to Babb; and (3) the same called her a "mow mow" (which Babb interpreted as "a grandma comment") during an investigation of a vulgar email.

Babb has not raised a genuine issue of material fact regarding her hostile-work-environment claim. Her allegations pale in comparison to the sort of conduct that this Court has deemed sufficiently "severe and pervasive" to create an objectively abusive environment. *See, e.g.*, *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 811–14 (11th Cir. 2010) (plaintiff's coworkers made gender-specific derogatory comments and showed plaintiff pornography); *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (supervisor gave plaintiff unwanted massages and stood so close that his body parts touched her). Given the facts alleged by Babb, the district court correctly ruled that her hostile-work-environment claim failed as a matter of law.[5]

### IV

For the foregoing reasons, we affirm the district court's grant of summary judgment on Babb's ADEA age-discrimination claim, Title VII retaliation claim, and hostile-work-environment claim. We reverse the district court's grant of

---

[5] We have not decided whether hostile-work-environment claims are cognizable under the ADEA. We need not do so, because even if such claims are cognizable as a general matter, Babb's claim here fails as a matter of law.

summary judgment on Babb's Title VII gender-discrimination claim and remand

for consideration under the "motivating-factor" standard.

**AFFIRMED** in part; **REVERSED** and **REMANDED** in part.

24

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

July 16, 2018

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 16-16492-FF
Case Style: Noris Babb v. Secretary, Department of Veter
District Court Docket No: 8:14-cv-01732-VMC-TBM

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, each party to bear own costs.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Janet K. Mohler, FF at (404) 335-6178.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs