UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NORIS BABB,

    Plaintiff,

v.                        Case No. 8:14-cv-1732-VMC-TBM

DENIS McDONOUGH, Secretary,
DEPARTMENT OF VETERANS AFFAIRS,

    Defendant.
_____/

**ORDER**

This matter comes before the Court upon consideration of Defendant Secretary of the Department of Veterans Affairs' Motion for Summary Judgment (Doc. # 52), filed on April 11, 2016. Defendant filed a supplemental memorandum in support of the Motion for Summary Judgment on October 14, 2021. (Doc. # 124). Plaintiff Noris Babb responded on November 5, 2021. (Doc. # 127). Defendant replied on November 18, 2021 (Doc. # 129), and on November 30, 2021, with leave of Court, Dr. Babb filed a Sur-Reply. (Doc. # 132). For the reasons that follow, the Motion is granted in part and denied in part.

I.   **Background**

    **A. Dr. Babb's Role as a VA Pharmacist in Geriatrics**

Dr. Babb is a clinical pharmacist who is currently employed at the C.W. Bill Young VA Medical Center. (Doc. # 27

1

at ¶ 8). At the time of the events in question, she was approximately 52 years old and was in a GS-12 position. (Id.). Dr. Babb worked in the geriatric primary care clinic at the VA from 2006, until June of 2013. (Babb Decl. Doc. # 68-2 at ¶¶ 1, 26). During her time in the geriatrics clinic, she was part of an "interdisciplinary team." (Hull Dep. Doc. # 54 at 8:21). One of her supervisors at the geriatrics clinic, Dr. John Hull, explained: "the interdisciplinary team is a team of caregivers that work closely together to achieve better outcomes for complex patients. . . . [T]he idea is that a group of people working together and sharing information can achieve success in complex situations much better than a solo practitioner." (Id. at 8:23-9:4).

Dr. Hull explained that the patients seen at the geriatrics clinic were "the oldest of the old" facing "frailty . . . usually psychosocial problems and a high rate of dementia." (Id. at 8:2-10). Dr. Hull noted, "we try to select patients that have multiple medical, psychosocial and functional problems, which means that our rate of death is much, much higher than a regular primary care environment, and dealing with the issues of death and dying palliative care." (Id. at 7:21-25).

2

At that time, Dr. Babb held an Advanced Scope, which means that she could perform Disease State Management. (Babb Decl. Doc. # 68-2 at ¶ 5). Disease State Management entails a pharmacist independently managing patient care for specific conditions (diabetes, hypertension, and cholesterol), including writing prescriptions for these ailments without consulting a physician. (Id.; Justice Decl. Doc. # 52-2 at ¶ 2).

### B. Dr. Babb Experiences Tribulations at Work

Starting in 2011, Dr. Babb's clinic was part of a national "Patient Aligned Care Team" or PACT program, which resulted in many staffing changes at the VA. (Doc. # 68-2 at 22; Babb Decl. Doc. # 68-2 at ¶ 8). In 2012 and 2013, the VA was in the process of implementing national qualifications standards so that pharmacy employees who spent at least 25% of their time practicing under an Advanced Scope would be promoted to a GS-13. (Justice Dep. Doc. # 55 at 63-65; Babb Decl. Doc. # 68-2 at ¶ 11). Understandably, Dr. Babb — a GS-12 pharmacist with an Advanced Scope — sought such a promotion.

In June of 2012, Dr. Marjorie Howard, who was Dr. Babb's supervisor at that time, ask Dr. Babb whether she would consider a primary care position in "Module B" of the VA that

3

had recently been vacated. (Howard Dep. Doc. # 57 at 52:8-10). Dr. Howard brought up the Module B position because she did not think that Dr. Babb could meet the 25% requirement for the GS-13 promotion in geriatrics. (Id. at 54:19-25, 55:19-20). Dr. Babb declined, even though Dr. Babb recognized that her direct supervisor said that moving to Module B "was the only way [Dr. Babb] could get a GS-13." (Babb Dep. Doc. # 59 at 86:2-3; Doc. # 52-2 at 29). According to Dr. Babb, treating geriatric patients was her professional calling. (Babb Decl. Doc. # 68-2 at ¶ 10).

In August of 2012, the service agreement between the pharmacy and the geriatrics clinic was being renegotiated. (Williams Dep. Doc. # 56 at 6:2-5). Dr. Babb worked with Dr. Hull and others in the geriatrics clinic on a separate draft service agreement that supported Dr. Babb's use of an Advanced Scope in the geriatrics clinic performing Disease State Management. (Id. at 17:2-10). However, the service agreement that was ultimately signed did not call for Dr. Babb to perform Disease State Management, and in February of 2013, Dr. Babb's Advanced Scope was removed. (Babb Dep. Doc # 59 at 35:6-9; Wilson Dep. Doc. # 53 at 16:17).

Dr. Leonard Williams is the Chief of Geriatrics and Extended Care at the VA, Bay Pines. (Williams Dep. Doc. # 56

4

at 4:15-17). He was the person who decided that Dr. Babb should not perform Disease State Management on VA geriatric patients. (Id. at 18:14-19). In his opinion, Dr. Babb's role as a geriatrics pharmacist was to check for dangerous drug interactions and answer patient and caregiver questions about medications because geriatric patients are often prescribed multiple medications. (Id. at 13:1-7).

Dr. Williams provided several reasons for omitting Dr. Babb's provision of Disease State Management from the service agreement. As Dr. Williams explained, "[m]any times in very frail, elderly patients we don't need to treat their hypertension or we don't need to treat it aggressively as you would through [Disease State Management] protocols, because basically the damage that was going to be done by high blood pressure by that time was done." (Id. at 11:22-12:1). And "it could be injurious to the patient" to try to control conditions such as high blood pressure through Disease State Management in the geriatrics department. (Id. at 12:3).

Dr. Williams indicated that a geriatrics pharmacist needed to be available to "let the patient know of significant potential side effects and what to look for" and "see [a] patient before they left the clinic and make sure that the patient or the caregiver understood what we were doing." (Id.

at 13:19-24). If Dr. Babb was performing Disease State Management consultations with patients, "she wouldn't be able to work in the essential role of a clinical pharmacist or consulting pharmacist in the geriatric clinic; and that is one of seeing the patients and going over what was usually a very complicated and long list of medications, and looking to see if there were any obvious possibilities of drug/drug interactions, that the physician should have known about." (Id. at 12:22-13:7).

In September of 2012, Dr. Babb sought to participate in a multi-day training, but Dr. Howard specified that Dr. Babb could not attend because (1) Dr. Babb had patients scheduled at the time of the training and Dr. Babb's attendance of the course would therefore impact patient care, (2) Dr. Babb would not benefit from the training because she already had knowledge of the information being presented, and (3) it was too late to register for the program. (Doc. # 52-3 at 59).

In October of 2012, Dr. Howard and Dr. Babb discussed Dr. Babb's "mid-term evaluation," where Dr. Babb received "fully successful" instead of "outstanding" in mentoring. (Babb Decl. Doc. # 68-2 at ¶¶ 14-15). Dr. Babb filed a grievance with respect to her score, and eventually the "fully successful" was "upgraded" to reflect "outstanding," but Dr.

Babb "felt belittled that she [was treated] this way." (Id.
at ¶¶ 15-16).

### C. **Dr. Babb is not Selected for Anticoagulation**

At the time Dr. Babb realized that her Advanced Scope
was in jeopardy, she started asking for training in
anticoagulation, but that training was not provided. (Babb
Dep. Doc. # 59 at 9:4-7, 116:1-3). The anticoagulation clinic
was understaffed, and the physician managing that clinic
testified that they could never keep up with the patients'
demands for anticoagulation. (Stewart Dep. Doc. # 60 at 60:2-
16).

When a position was opened in anticoagulation, Dr. Babb
applied. A three-member panel comprised of Dr. Kim Hall, Dr.
Catherine Sypniewski, and Dr. Robert Stewart conducted the
interview. Dr. Hall provided detailed testimony about the
interview, remembering that Dr. Babb used unprofessional
language (such as "crap" and "screwed up") and harshly
criticized other medical providers, which made Dr. Hall
question whether Dr. Babb would be a good fit for the busy
anticoagulation department where good communications skills
were a top priority. (Doc. # 52-2 at 141). Dr. Sypniewski
explained that the candidates that were selected had
"significantly more experience" in anticoagulation when

7

compared to Dr. Babb. (Doc. # 52-2 at 152). Dr. Stewart confirmed that Dr. Babb's anticoagulation experience was "nowhere near" the experience of the selected candidates. (Doc. # 52-2 at 160).

Dr. Babb interviewed poorly due to "anxiety and stress," admitting "that was the worst interview of my life." (Babb Dep. Doc. # 59 at 115:22-24, 124:23). Dr. Babb has conceded that she did not have any direct experience independently managing anticoagulation patients. (Id. at 119:17-19). Dr. Babb was notified that she was not selected for the anticoagulation position on April 23, 2013. (Doc. # 27 at ¶ 10(l)). Two younger pharmacists, Dr. Sara Grawe (age 26) and Dr. Amy Mack (age 30), scored highest at the interview and were selected for the anticoagulation positions. (Doc. # 52-2 at 160).

During these and other staffing changes at the VA, someone sent an anonymous and "vulgar" letter to Dr. Gary Wilson. (Babb Decl. Doc. # 68-2 at ¶ 22). An Administrative Investigation Board was initiated to determine who sent the troubling letter. On April 8, 2013, Dr. Keri Justice testified at the Administrative Investigation Board that Dr. Babb was one of the "mow-mows" – the "squeaky wheels" who are "never happy, always complaining." (Doc. # 68-2 at 140). In the same

Administrative Investigation Board, Dr. Wilson testified that
he believed Dr. Babb "felt that [she was] discriminated
against over age and sex." (Doc. # 68-2 at 122). Dr. Babb
"was really upset that anyone would think [she is] such a low
person to do something like" send an anonymous letter
complaining about others in a vulgar manner. (Babb Decl. Doc.
# 68-2 at ¶ 22). However, it is not disputed that 26 employees
were questioned about the origins of the troubling letter,
including Drs. Trask and Truitt. (Doc. # 70-1 at 15).

### D. **Dr. Babb "Floats" after Module B Transfer Denied**

Dr. Babb requested a lateral transfer to Module B to
work as a Clinical Pharmacy Specialist (the position that she
previously rejected) in an effort to secure a GS-13 promotion,
but at that point, and with the passage of approximately nine
months, it was too late. (Babb Decl. Doc. # 68-2 at ¶ 21).
Dr. Justice denied Dr. Babb's request to be transferred to
Module B on April 24, 2013. (Id.). Notably, a younger
pharmacist, Dr. Natalia Schwartz, also sought to be
transferred to Module B, but management already decided that
the position would not be filled. (Doc. # 52-2 at 185).

Dr. Babb continued in the geriatrics clinic after her
Advanced Scope was removed, but she was "extremely
depressed." (Babb Dep. Doc. # 59 at 46:21-23). She "had gone

from being a happy team player to someone that just came in, closed the door to [her] office, and left at 4:30." (Id. at 47:12-15). Dr. Babb felt like she was in "a very difficult work environment" and that "[i]t was probably the lowest point of [her] professional career." (Id. at 47:21-48:1).

Dr. Babb requested to move to the "float pool" in April 2013 and began "floating" in June 2013. (Doc. # 52-3 at 11; Babb Dep. Doc. # 59 at 129:11-12). Around that time, Dr. Babb's then supervisor, Dr. Robert Stewart, received two complaints about Dr. Babb. (Stewart Dep. Doc. # 60 at 52:11-12). The first complaint was that Dr. Babb was rude to a patient. (Babb Dep. Doc. # 59 at 142:21-23). The second complaint claimed that Dr. Babb was not available to her co-workers at the clinic. (Id. at 143:4-5). Dr. Babb learned about these complaints when she opened a sealed envelope that Dr. Stewart had mistakenly left on her desk (Stewart Dep. Doc. # 60 at 53:14-24; Babb Dep. Doc. # 59 at 141:1-19). Dr. Babb faced no discipline or counseling for these events, and she testified that these events did not affect her performance appraisal. (Babb Dep. Doc. # 59 at 140:19-20). Dr. Babb testified that she enjoyed the camaraderie of the other pharmacists in the float pool (Id. at 130:14-15);

nevertheless, she filed an informal EEOC complaint on May 6, 2013. (Babb Decl. Doc. # 68-2 at ¶ 24).

### E. **Dr. Babb Applies to Two GS-13 Positions**

Dr. Babb continued to apply for GS-13 positions. In late 2013, Dr. Babb applied for a GS-13 position, but it was offered to a younger pharmacist, Dr. Hetal Bhatt-Chugani. (Babb Dep. Doc. # 59 at 128:23-129:1; Doc. # 68-2 at 87:24-88:1). However, in early 2014, two GS-13 positions were posted: (1) a PACT assignment split between Modules B and D (this was the previously vacant position in Module B combined with another vacancy in Module D) and (2) a half anticoagulation and half Palm Harbor clinic position. (Doc. # 52-3 at 29; Babb Dep. Doc. # 59 at 134:11-12).

The job announcement for the PACT position split between Modules B and D stated that the position was comprised of "Four 9 hour shifts Tuesday through Friday 7:00 am – 4:30 pm with a 4 hour shift Saturday 8:00am-12:00pm [with] Nights, weekends and holiday on a fair and equitable rotation schedule." (Doc. # 52-3 at 30). In March of 2014, Dr. Babb was informed she was selected for the PACT position split between Modules B and D. (Babb Dep. Doc. # 59 at 176:17-22). On April 2, 2014, Dr. Justice submitted paperwork to facilitate Dr. Babb's promotion to GS-13. (Doc. # 52-3 at 45-

11

46). Dr. Justice marked "excellent" on all of the forms and made handwritten comments stating that "Dr. Babb is an excellent practitioner with a broad knowledge of clinical pharmacy. She is great with patients!" (Id.). A VA Director approved Dr. Babb's promotion in August of 2014. (Doc. # 52-3 at 49-50).

After Dr. Babb started working in her new position, she felt she was being treated unfairly with respect to holiday pay. "After reviewing her time cards, later, and time cards of other employees she learned that due to the scheduling, she was only entitled to four hours Holiday pay for each of the five legal federal Holidays on a Monday . . . [h]owever, other employees were being paid the full amount of a holiday." (Doc. # 27 at ¶ 10(p)). Dr. Babb testified, "after I found out about the Monday federal holiday issue, I was very upset about that." (Babb Dep. Doc. # 59 at 139:20-21). The VA offered to permanently change her schedule such that she would receive eight hours of holiday pay for the Monday legal holidays, but Dr. Babb declined. (Doc. # 52-3 at 144).

F. **Related Prior Litigation and EEOC Activity**

On February 26, 2013, Donna Trask and Anita Truitt (both VA pharmacists) filed an age and gender discrimination suit against the VA. (Case No. 8:13-cv-536-MSS-TBM (M.D. Fla.

2013)). In connection with those proceedings, Dr. Babb sent statements in support of Drs. Trask and Truitt by email to an EEOC investigator on April 26, 2012, May 10, 2012, and May 11, 2012. (Doc. # 27 at ¶ 5; Babb Dep. Doc. # 59 at 112:23-113:1). She also provided deposition testimony in support of Drs. Trask and Truitt on March 24, 2014. (Doc. # 68-2 at 38).

Dr. Babb testified in this case that "my whole career had changed after I had been a witness in the Truitt and Trask case. That up until then pharmacy administration had been in support of me." (Babb Dep. Doc. # 59 at 48:15-17). Dr. Babb specified that after she "participated in the EEO activity for Drs. Truitt and Trask, [her] career took a turn in a bad direction." (Id. at 112:17-19). Along the same lines, Dr. Babb testified: "Everything that happened in disqualifying me was after I testified in the Truitt and Trask case; and Truitt and Trask were discriminated against because they were older females." (Id. at 110:13-16).

The district court did not agree that Drs. Trask and Truitt were discriminated against and granted summary judgment in favor of the VA on March 19, 2015. (Case No. 8:13-cv-536-MSS-TBM at Doc. # 101). The Eleventh Circuit affirmed in a published decision. Trask v. Sec'y, Dep't Veterans Affs, 822 F.3d 1179 (11th Cir. 2016).

13

Dr. Babb also participated in her own protected activity. She verbally opposed age and gender discrimination in a lengthy conversation with Dr. Justice on February 8, 2013. Dr. Babb requested that her union representative be present at the February 8, 2013 meeting where she voiced her complaints to Dr. Justice, but the representative failed to appear. (Doc. # 68-6 at 86). In addition, Dr. Babb filed an informal EEOC complaint on May 6, 2013, and also initiated this lawsuit.

G. **Comments on Age, Gender, or EEOC Activity**

Dr. Babb alleges Dr. Howard asked when Dr. Babb planned to retire in March of 2012. (Id. at 130:19-20). Dr. Howard does not remember asking Dr. Babb this question. (Doc. # 52-3 at 57). Dr. Babb had a negative relationship with Dr. Howard and called Dr. Howard "Cruella" and other names in emails to her colleagues because Dr. Babb felt Dr. Howard was "harsh in meetings" and "wasn't gentle and friendly." (Babb Dep. Doc. # 59 at 161:9-16; Doc. # 59 at 216).

In addition, when a co-worker asked Dr. Babb if she had seen the movie "Magic Mike," Dr. Justice remarked that the movie was geared toward middle-aged women, which made Dr. Babb upset. (Babb Dep. Doc. # 59 at 62:13-19). Dr. Babb testified that she would not have been worried if Dr. Justice

14

called the movie a "chick-flick," but she felt "middle-aged" was not an appropriate comment. (Id. at 62:20-24). When Dr. Justice referred to Dr. Babb as a "mow mow," Dr. Babb thought that Dr. Justice was calling her a "grandma." (Id. at 62:3-7).

Dr. Babb does not recall any other comments about her age or gender and she has never heard any comments about her EEOC activity. (Id. at 61:24-62:11, 113:15-18, 121:12-16, 132:5-7). Dr. Babb also revealed during her deposition that she "took it all personally" and she "couldn't stop crying." (Id. at 183:23-184:8).

### H. **Dr. Babb Files Suit**

Dr. Babb initiated this action on July 17, 2014. (Doc. # 1). She filed the operative complaint – the Third Amended Complaint - on December 19, 2014. (Doc. # 27). The Third Amended Complaint contains the following counts: retaliation (Count I), gender and age discrimination (Count II), a hostile work environment based on gender and age and a retaliatory hostile work environment claim(Count III), and injunctive relief (Count IV). The VA then sought summary judgment (Doc. # 52), which this Court granted on Counts I, II, and III (Doc. # 83). Relying on Eleventh Circuit precedent, this Court analyzed Dr. Babb's Title VII retaliation and discrimination

claims (Counts I and II) under the McDonnell Douglas burden-shifting framework. This Court found that although Dr. Babb had established a prima facie case under the statute, the VA proffered non-pretextual reasons for the adverse employment actions, and Dr. Babb could not point to any weaknesses, implausibilities, or flaws in the VA's employment justifications.

This Court then analyzed Dr. Babb's hostile work environment and retaliatory hostile work environment claims (Count III) under Gowski v. Peake, 682 F.3d 1299 (11th Cir. 2012), which requires that a plaintiff show harassment that is "severe or pervasive" to establish either a hostile work environment or a retaliatory hostile work environment claim. Analyzing Dr. Babb's adverse employment outcomes under the Gowksi standard, this Court determined that the events underlying Dr. Babb's claims were not sufficiently "severe or pervasive" to be actionable. This Court thus granted summary judgment to the VA on both Dr. Babb's hostile work environment claim and her retaliatory hostile work environment claim.

### 1. The First Eleventh Circuit Appeal

Dr. Babb appealed the grant of summary judgment to the Eleventh Circuit, which reversed and remanded on Babb's gender discrimination claim but affirmed on everything else.

16

The Eleventh Circuit found that this Court erred by applying the McDonnell Douglas test rather than the Quigg motivating factor test to her "mixed motive" gender discrimination claim. Babb v. Sec'y, Dep't of Veterans Affs, 743 F. App'x 280, 286 (11th Cir. 2018). The Eleventh Circuit remanded the claim to this Court for evaluation under the Quigg motivating-factor test. Babb, 743 F. App'x at 286.

Reviewing Dr. Babb's age and gender discrimination claims, the Eleventh Circuit addressed Dr. Babb's contention that this Court erred in applying the McDonnell Douglas framework to her ADEA age-discrimination. The Court noted that if it "were writing on a clean slate, [it] might well agree." Id. at 287. Nevertheless, the Eleventh Circuit noted that it was bound to its decision in Trask v. Secretary, Department of Veterans Affairs, 822 F.3d 1179 (11th Cir. 2016), by prior-panel-precedent. Babb, 743 F. App'x at 287. Because the Eleventh Circuit in Trask applied the McDonnell Douglas standard to a federal-sector ADEA claim, the Court explained that it was bound by its determination there. Id. The Eleventh Circuit then reviewed this Court's findings under the McDonnell Douglas standard, finding no reversible error and affirming the grant of summary judgment as to Dr. Babb's ADEA age discrimination claim. Id. at 290–291.

Finally, evaluating Dr. Babb's hostile work environment and retaliatory hostile work environment claims under the Gowski standard, the Eleventh Circuit found that Dr. Babb had not raised a genuine issue of material fact, thus affirming this Court's grant of summary judgment as to that claim.

### 2. **The United States Supreme Court**

The Supreme Court granted certiorari on the question of whether the federal-sector provision of the ADEA required Dr. Babb to prove that age was a but-for cause of a challenged personnel action.

The Supreme Court explained that Section 633a(a)'s terms required a plaintiff to show only that "age discrimination plays any part in the way a decision is made[.]" Babb v. Wilkie, 140 S. Ct. 1168, 1178 (2020) ("Babb I") (emphasis added). The Court held that the "free from any discrimination" language means that personnel actions must be made in "a way that is not tainted by differential treatment based on" a protected characteristic. Id. at 1174. Thus, to prevail on an age discrimination claim under the ADEA, a plaintiff must show that age is "a but-for cause of discrimination—that is, of differential treatment—but not necessarily a but-for cause of a personnel action itself." Id. at 1173.

### 3. **The Eleventh Circuit's Subsequent Decisions**

Following the Supreme Court's decision in <u>Babb I</u>, the Eleventh Circuit reversed and remanded on Dr. Babb's age and gender discrimination claims and affirmed on Dr. Babb's Title VII retaliation, hostile work environment, and retaliatory hostile work environment claims.

The Eleventh Circuit then granted Dr. Babb's petition for rehearing on the issues of (1) whether the Supreme Court's decision in <u>Babb I</u> necessitated a re-examination of the Eleventh Circuit's previous rejection of her Title VII retaliation claim and (2) whether the intervening Eleventh Circuit decision <u>Monaghan v. Worldpay US, Inc.</u>, 955 F.3d 855 (11th Cir. 2020), undermined the previous rejection of her retaliatory hostile work environment claim. <u>Babb v. Sec'y, Dep't of Veterans Affs.</u>, 992 F.3d 1193 (11th Cir. 2021) ("<u>Babb II</u>").

Beginning with Dr. Babb's Title VII retaliation claim, the Eleventh Circuit found that the Supreme Court's decision in <u>Babb I</u> "undermined <u>Trask</u> to the point of abrogation." <u>Babb II</u>, 992 F.3d at 1200. The Eleventh Circuit explained that the Supreme Court's analysis of the ADEA's language informs its reading of Title VII. <u>Id.</u> (citing <u>Gomez-Perez v. Potter</u>, 553 U.S. 474, 487 (2008)). The Eleventh Circuit thus held that the <u>Babb I</u> "differential treatment" standard for evaluating

19

the federal-sector provision of the ADEA also applied to Title VII retaliation claims. Id.

The Eleventh Circuit then addressed the effect of the intervening Monaghan decision on Dr. Babb's retaliatory hostile work environment claim. Id. at 1206. The Court explained that although Dr. Babb had not distinguished between her hostile work environment claim based on age and gender and her hostile work environment claim based on retaliation, the subsequent Monaghan decision clarified that different standards governed each claim. Id. at 1206-07. As the Eleventh Circuit explained, Gowski had incorrectly grafted the "severe or pervasive" standard onto retaliatory hostile work environment claims by packaging it as a hostile work environment, rather than a retaliation, claim. Id. at 1207.

The Eleventh Circuit held that the correct standard to apply to retaliatory hostile work environment claims was that set by Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006) and Crawford v. Carroll, 529 F.3d 961 (11th Cir. 2008). Burlington and Crawford held that to prevail on a retaliation claim, an employee must demonstrate the complained-of action "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."

Crawford v. Carroll, 529 F.3d at 974 (quoting Burlington Northern, 548 U.S. at 68)). The Eleventh Circuit concluded that after Monaghan, the "severe or pervasive" standard is no longer applicable to retaliatory hostile work environment claims and directed this Court to evaluate Dr. Babb's claim under the correct Burlington Northern-Crawford-Monaghan standard. Id. at 1209.

Now, on remand, this Court reconsiders Dr. Babb's claims under the proper standards — Babb I for Counts I and II and Crawford for Count III. Although Babb II only addressed Dr. Babb's Title VII retaliation claim, the Babb I differential treatment standard applies to claims of gender discrimination arising under the federal-sector provision of Title VII. See Durr v. Sec'y, Dep't of Veterans Affairs, 843 F. App'x 246, 247 (11th Cir. 2021) (noting that the Babb I standard applies to Title VII discrimination claims and remanding to the district court to evaluate age and gender discrimination and retaliation claims under the Babb I standard). Thus, Babb I governs Dr. Babb's Title VII age and gender discrimination claims as well as her Title VII retaliation claim.

With respect to Count III, Babb II requires this Court to revisit only Dr. Babb's retaliatory hostile work environment claim, not her hostile work environment claim

21

based on age and gender. Gowski is still applicable to hostile work environment claims based on age and gender post-Monaghan and thus Babb II does not disturb this Court's finding on Dr. Babb's hostile work environment claim.

## II.   **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at

trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

III. **Analysis**

   A. **Count I — Retaliation**

   A prima facie case of retaliation requires a plaintiff to establish that she (1) engaged in statutorily protected activity; (2) suffered an adverse employment action; and (3) established a causal link between the protected activity and the adverse employment action. Malone v. U.S. Att'y Gen., 858 F. App'x 296, 303 (11th Cir. 2021). "In the context of a retaliation claim, an adverse employment action is one that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. (citing Burlington Northern, 548 U.S. at 68 (2006)). To show a causal connection, the plaintiff needs to show that the protected activity played some part in the way the decision was made. Tonkyro v. Sec'y, Dep't of Veterans Affs., 995 F.3d 828, 835 (11th Cir. 2021) (holding that federal-sector plaintiffs need not "prove that their protected activity was a but-for cause of the adverse actions" and remanding the district court to determine causation under the standard enunciated in Babb I).

   Under Babb I, a showing of non-pretextual reasons for an employment decision is insufficient to defeat a prima facie case of retaliation. Id. at 1204. As the Eleventh Circuit explained, "even when there are non-pretextual reasons for an

24

adverse employment decision . . . the presence of those reasons doesn't cancel out the presence, and the taint, of discriminatory considerations." Varnedoe v. Postmaster Gen., No. 21-11186, 2022 WL 35614, at *3 (11th Cir. Jan. 4, 2022) (citing Babb II, 992 F.3d at 1199, 1204–05).

While Babb I lessened the burden on federal-sector plaintiffs asserting Title VII retaliation claims, Dr. Babb still must "present evidence that her protected activity played *any* role in [the adverse action]." Id. (finding the plaintiff did not meet her burden under Babb I where she "presented no affirmative evidence of any kind showing that her EEOC complaint was a factor in her work reassignment" and argued that "no . . . legitimate reason for the reassignment existed").

To prove causation in a Title VII retaliation case, "[t]he plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action." Debe v. State Farm Mut. Auto. Ins., 860 F. App'x 637, 639 (11th Cir. June 8, 2021). A plaintiff can show a causal connection by showing a close temporal proximity between her employer's discovery of the protected activity and the adverse action, but the temporal proximity must be "very close." Thomas v. Dejoy, No. 5:19-

cv-549-TKW-MJF, 2021 WL 4992892, at *10 (N.D. Fla. July 19, 2021) (looking to temporal proximity test post-Babb and citing Debe). For example, a district court found causation where "numerous adverse events . . . occurred within weeks after *each* of [the plaintiff's] protected acts." Norman v. McDonough, No. 2:20-cv-01765-KOB, 2022 WL 3007595, at *9 (N.D. Ala. July 28, 2022).

Here, the first element of Dr. Babb's prima facie case is satisfied because Dr. Babb engaged in protected activity when she participated in Drs. Trask and Truitt's employment discrimination lawsuit. She has also pursued her own claims against the VA for discrimination and retaliation. In addition, Dr. Babb verbally opposed what she felt were discriminatory practices in a lengthy conversation with Dr. Justice on February 8, 2013.

The second element is also satisfied. Dr. Babb claims that she faced adverse employment actions when her Advanced Scope was removed, when she was not selected for the anticoagulation position, when she was denied a lateral move to Module B, when a younger pharmacist (Dr. Martinez) was given a GS-13 position that was not advertised, and when she was given lower holiday pay. (Doc. # 27 at ¶ 15). This Court previously found that Dr. Babb experienced adverse employment

actions under the "serious and material change" standard articulated in Crawford v. Carroll, 529 F.3d 961 (11th Cir. 2008). (Doc. # 83 at 21-22). In Babb II, however, the Eleventh Circuit clarified that Title VII retaliation claims require only a showing that an employment action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Babb II, 992 F.3d at 1207. Given that this Court previously found Dr. Babb experienced adverse employment actions under the more stringent "serious and material change" standard, and that the parties do not contest that Dr. Babb experienced adverse employment actions with respect to her retaliation claim, the second element is satisfied.

As to the third element, this Court previously found that a reasonable jury could determine that Dr. Babb established causation because she participated in a protected activity and faced adverse employment actions shortly thereafter. (Doc. # 83 at 22). Dr. Babb's protected activity in the Trask and Truitt case started when she provided statements to the EEOC in April and May of 2012. Her EEOC activity in that case continued through March 24, 2014, when she testified in a deposition. (Doc. # 68-2 at 38). Dr. Babb had a pointed conversation with Dr. Justice on February 8,

2013, opposing gender and age discrimination, and she filed a complaint with the EEOC in her own case alleging discrimination on May 6, 2013.

This Court nevertheless concluded that Dr. Babb had not established a cognizable Title VII retaliation claim because the VA offered legitimate and non-retaliatory reasons for every employment action and Dr. Babb failed to establish these reasons were pretextual. Under Babb II, however, "the existence of non-pretextual reasons for an adverse employment decision . . . doesn't cancel out the presence, and the taint, of discriminatory considerations." Babb II, 992 F.3d at 1204.

In the wake of Babb II, this Court now concludes that a reasonable jury could find that retaliation for Dr. Babb's EEO activity tainted the decision-making regarding the adverse employment actions. Again, close temporal proximity between an employer's discovery of protected active and an adverse employment action can establish causation in a Title VII retaliation case. Thomas, 2021 WL 4992892, at *10. Dr. Babb verbally opposed age and gender discrimination in a 40-minute encounter with Dr. Justice on February 8, 2013 (Doc. # 59 at 203-204), and Dr. Babb's Advanced Scope was removed just days later on February 15, 2013. (Babb Decl. Doc. # 68-2 at ¶ 19). Dr. Babb's supervisors had knowledge of her

participation in protected activity by February 8, 2013 at the latest. See Debe, 860 F. App'x at 639 ("The plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action.").

Not long after that, on April 24, 2013, Dr. Justice denied Dr. Babb's request for a lateral transfer (and accompanying raise to a GS-13 position). (Babb. Decl. Doc. # 68-2 at ¶ 21). Dr. Babb's unsuccessful anticoagulation interview and non-selection for that GS-13 position also occurred in April of 2013. Further, Dr. Babb submits that she gave testimony in the Trask and Truitt case on March 24, 2014, and that she was denied holiday pay during the same time frame in March of 2014.

The VA provided non-pretextual reasons for all of these employment actions. While Dr. Babb's EEO action cannot be the but-for cause of the ultimate employment *outcome*, Babb II requires inquiry into whether the EEO activity affected Dr. Babb's *treatment*. The removal of Dr. Babb's Advanced Scope, her non-selection for the anticoagulation position, and reduced holiday pay all occurred within a short period of time following her EEO activity. True, Dr. Babb's supervisors may have contemplated the removal of her Advanced Scope long

29

before her conversation with Dr. Justice on February 8, 2013. Still, a reasonable jury could find that, given that the removal of Dr. Babb's Advanced Scope occurred less than a week after her conversation, Dr. Babb's EEO activity could have played a role in the removal.

Likewise, a reasonable jury could find that the two-month period between Dr. Babb's conversation with Dr. Justice and her non-selection for the anticoagulation position indicates that the two occurrences were not unrelated. And Dr. Babb's denial of holiday pay — even though she was then offered a schedule adjustment — occurred during the same month that she gave testimony in the Trask and Truitt case, providing a basis for a jury to find that this protected activity influenced the VA's decision making.

Accordingly, the VA's Motion for Summary Judgment is denied with respect to Count I.

### B. Count II — Age and Gender Discrimination

Title VII states in pertinent part that "[a]ll personnel actions affecting employees . . . in executive agencies . . . shall be made free from any discrimination on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). Again, the Eleventh Circuit recently held that the Supreme Court's decision in Babb I, which interpreted the nearly

identical federal-sector provision of the Age Discrimination in Employment Act ("ADEA"), is applicable to Title VII federal-sector cases. See Babb II, 992 F.3d at 1205 ("If a decision is not "made free from any discrimination based on" that which § 2000e-16(a) protects, then an employer may be held liable for that discrimination regardless of whether that discrimination shifted the ultimate outcome.").[1]

As the Supreme Court explained in Babb I, the language "shall be made free from any discrimination" means that personnel actions must be "untainted by any consideration" of the protected factor. Babb I, 140 S. Ct. at 1171. "If . . . discrimination plays any part in the way a decision is made, then the decision is not made in a way that is untainted by

_____

[1] The parties dispute the applicability of Quigg v. Thomas County School District, 814 F.3d 1227 (11th Cir. 2016) to Dr. Babb's discrimination claim. Because Babb II clarified that the appropriate standard for federal-sector Title VII discrimination claims is whether a protected trait is the but-for cause of differential treatment, the motivating factor test of Quigg likely does not apply. Babb II, 992 F.3d at 1205; see also Durr, 843 F. App'x 246 at 247 (finding that Babb I governed the plaintiff's claims of age and gender discrimination and retaliation under Title VII). Even if Quigg did govern Dr. Babb's claims, the outcome would not differ because she has not provided evidence that her age or gender was a motivating factor in the adverse employment actions. Quigg, 814 F.3d at 1235; see Tonkyro, 995 F.3d at 836 ("We perceive no material difference between the motivating-factor standard we have applied to substantive hostile work environment claims and the standard articulated by the Supreme Court in Babb.").

any such discrimination." Id. at 1174. "As a result, [the protected factor] must be a but-for cause of discrimination — that is, of differential treatment — but not necessarily a but-for cause of the personnel action itself." Id. at 1173. In other words, to state a claim under Title VII, the protected factor "must be the but-for cause of *differential treatment*, not that the [protected factor] must be a but-for cause of *the ultimate decision*." Id. at 1174.

Under Babb I, district courts thus no longer use the McDonnell Douglas framework to assess discrimination claims that do not require but-for causation as to the ultimate decision. See Babb II, 992 F.3d at 1204 ("[I]t seems that the Supreme Court accepted Babb's argument 'that the District Court should not have used the McDonnell Douglas framework.'"); see also Lewis v. Sec'y of U.S. Air Force, No. 20-12463, 2022 WL 2377164, at *10 (11th Cir. June 30, 2022) (explaining that Babb I "foreclosed using the full McDonnell Douglas framework regarding ADEA claims and Title VII retaliation claims as to federal-sector employees").

In Babb II, the Eleventh Circuit explained that discriminatory considerations can give rise to a colorable Section 2000e-16(a) claim "even when there are non-pretextual reasons for an adverse employment decision" because "the

presence of those reasons doesn't cancel out the presence, and the taint, of discriminatory considerations." Babb II, 992 F.3d at 1204. Thus, under the Babb I and Babb II framework, Babb needs to show only that her age played a part in the way an employment decision was made — that is, that the decision was "tainted" by discrimination. Babb I, 140 S. Ct. at 1174; see also Durr v. Sec'y, Dep't of Veterans Affairs, 843 F. App'x 246, 247 (11th Cir. 2021) (explaining that, after Babb I, "a plaintiff's claim survives if 'discrimination played *any part* in the way a decision was made'" (internal alterations omitted)).

While Babb I altered the standard for evaluating the presence of discrimination, showing that a protected factor was the but-for cause of the challenged employment decision still plays an important role in determining the appropriate remedy. Babb I, 140 S. Ct. at 1177. Showing that discrimination was the but-for cause of the ultimate employment decision or outcome will unlock all available forms of relief such as reinstatement, back pay, and compensatory damages. Id. at 1171, 1177–78. But if a plaintiff makes only the lesser showing, that is, if a plaintiff shows that discrimination was a but-for cause of differential treatment but not the but-for cause of the employment decision

itself, that plaintiff can still seek injunctive or other forward-looking relief. Id. at 1178.

### 1. Non-selection for Anticoagulation

The Court first examines Dr. Babb's claim with respect to her non-selection for the open anticoagulation position. Dr. Babb argues that she was subject to differential treatment because of her age because (1) she was not hired for the position despite her purported qualifications and (2) the position was filled by two younger female pharmacists. (Doc. # 52-2 at 160). Dr. Babb also argues that she was subjected to differential treatment because of her gender by not being selected for the anticoagulation position. (Doc. # 27 at ¶ 23). However, because two female pharmacists were selected for the position, and because Dr. Babb does not provide any further evidence indicating gender affected her treatment during the selection process, her non-selection for the position cannot support a claim of gender discrimination.

Although Babb I lessened the burden that federal-sector plaintiffs must show, allegations of differential treatment must be based on more than "mere speculation." Malone v. U.S. Att'y Gen., 858 Fed. App'x 296, 303 (11th Cir. 2021) (citing Cincinnati Ins. Co. v. Metro Props., Inc., 806 F.2d 1541, 1544 (11th Cir. 1986)). The Eleventh Circuit

has found summary judgment on a racial discrimination claim proper where the plaintiff could not "point to any record evidence that his application . . . was treated differently because he is white." Id. at 301; see also Buckley v. McCarthy, No. 4:19-CV-49 (CDL), 2021 WL 2403447, at *1, *6 (M.D. Ga. June 11, 2021) (granting summary judgment for defendant under the Babb I standard because the evidence did not demonstrate that race played any role in the decision to remove plaintiff from federal service even though plaintiff was the only Black provider at the subject clinic and contended that she was assigned fewer patients and that her coworkers called her an "angry Black woman"); cf. Bernea v. Wilkie, No. 20-cv-82459, 2021 WL 6334929, at *6 (S.D. Fla. Dec. 7, 2021) (finding circumstantial evidence sufficient to support a claim of differential treatment based on age discrimination where a supervisor stated plaintiff's "age affected his ability to complete tasks").

Here, Dr. Babb's belief that age played a role in her non-selection for the anticoagulation position rests on the fact that the two pharmacists selected for the position were younger than her and that the selected pharmacists received points for doing a residency. (Babb Dep. Doc. # 59 at 186:9-13).

The statements of the members of the panel that conducted Dr. Babb's interview demonstrate that Dr. Babb's lack of experience and poor interview, rather than age discrimination, motivated the VA's hiring decision. (Doc. # 52-2 at 140–41). Dr. Hall testified that the "selectees' prior experience indicated to the panel that they should be capable of doing the job in an efficient and skilled manner [and] should require little training to practice independently," while Dr. Babb "did not have any direct experience in anticoagulation." (Id. at 140). Dr. Sypniewski explained that the selected candidates "had significantly more experience in the applied for position . . . [t]hey knew and were familiar with the workings of the position to which they had applied, and their experience in anti-coag enabled them to answer the questions with examples." (Id. at 152).

In contrast, Dr. Sypniewski remembered that Dr. Babb appeared nervous at her interview and did not answer the panel's questions with "specific examples." (Id. at 153). In his testimony, Dr. Hall remembered that Dr. Babb used unprofessional language and harshly criticized other medical providers. (Id. at 141). Dr. Babb admitted that the interview was "the worst interview of [her] life" and that she did not have any direct experience independently managing

anticoagulation patients. (Babb Dep. Doc. # 59 at 124:23, 119:17-19).

Dr. Babb also argues that the selection process for the anticoagulation treatment subjected her to differential treatment based on age by favoring pharmacists who are residency-trained rather than those who are board-certified and trained by experience. (Doc. # 27 at ¶ 10b; Doc. # 127 at 35-36). The crux of Dr. Babb's argument is that the consideration of residency experience by the panel subjected her to differential treatment because residency-trained pharmacists tend to be younger. (Doc. # 68 at ¶ 20; Doc. # 68-3 at 75).

The selected candidates' residencies played a role in their selection as Dr. Sypniewski explained that the selected candidates "[h]ad significantly more experience in the applied for position. They had either done residencies where they were required to work in anti-coag clinic, or they actually already were processing anti-coag consults, or they had actually worked in anti-coag clinic post-residency." (Doc. # 52-2 at 152). In particular, the scoring sheet for candidates for the anticoagulation position awarded candidates three points for residency and up to five points for anticoagulation experience but provided no basis for

37

awarding points based on general experience as a pharmacist.
(Doc. # 68-6 at 100).

While the selection criteria for the anticoagulation
position places a premium on residency, Dr. Babb provides no
evidence from which a reasonable jury could conclude that age
influenced the decision to include residency in the selection
criteria. In his deposition, Dr. Stewart explained that:

> [I]t is my opinion that a residency should be
> considered much more and . . . carry higher points
> than a board certification [because] a residency is
> one year of intensive focused training, mentoring,
> and learning for a pharmacist where they get
> extensive experience in disease state management,
> and disease state management is what a PACT
> pharmacist would be doing a majority of their day
> . . . I felt that having the experience of a
> residency as well as providing more points on the
> scoring sheet for a pharmacist who was actually
> doing the job at the time they applied; so a
> pharmacist that is prescribing has an advanced
> scope and is conducting disease state management
> should get more points than someone that is not,
> that is my belief.

(Doc. # 68-3 at 70-71). Dr. Stewart also believed there is
"no substitute for the experience that someone gets in
residency when it comes to disease state management advanced
scope." (Id. at 74).

Although Dr. Babb expressed her disagreement with the
consideration of residency in the selection criteria in her
deposition, she did not provide evidence that age

38

discrimination motivated the consideration. (Doc. # 68-2 at
22). As this Court previously noted, courts should not be in
the business of adjudging whether employment decisions are
prudent or fair, but should merely determine whether an
unlawful animus motivates a challenged employment decision.
(Doc. # 83 at 28); see Elrod v. Sears, Roebuck and Co., 939
F.2d 1466, 1470 (11th Cir. 1991) ("Federal courts do not sit
as a super-personnel department that reexamines an entity's
business decisions.") (internal quotations omitted). Dr.
Stewart's testimony indicates that the decision to consider
residency as part of the selection criteria for the
anticoagulation position was motivated by the belief that
applicants who had completed a residency were better prepared
and trained for the position.

Of course, under Babb II, non-pretextual reasons for
differential treatment alone are insufficient to defeat an
otherwise cognizable claim of discrimination under Title VII.
Babb II, 992 F.3d at 1204. However, the party alleging
discrimination must still provide evidence, whether
circumstantial or otherwise, indicating that discrimination
played any role in the way a decision was made.

Here, Dr. Babb has not provided any evidence that would
provide a basis for a reasonable jury to determine that age

influenced the decision to award points for residency. The only record evidence Dr. Babb has provided is Dr. Stewart's statement that "[a] lot" of pharmacists pursuing residencies are right out of school. (Doc. # 68-3 at 75). Although Dr. Babb alleges in her complaint that residencies are recent in pharmacy, she cites to no evidence in the record in support of this claim. "Mere conclusions and unsupported factual allegations are legally insufficient to create a dispute to defeat summary judgment." <u>Bald Mountain Park, Ltd. v. Oliver</u>, 863 F.2d 1560, 1563 (11th Cir. 1989). Even under the flexible <u>Babb II</u> standard, the "record as a whole could not lead a rational trier of fact" to find that age animated the consideration of residency by the selection panel. <u>Saltzman v. Bd. of Comm'rs of the N. Broward Hosp. Dist.</u>, 239 Fed. Appx. 484, 487 (11th Cir 2007).

Thus, Dr. Babb has not provided any evidence suggesting that the interview panel for the anticoagulation position considered age when evaluating residency. In light of Dr. Stewart's belief that residency provides the most effective training, Dr. Babb has not identified a discriminatory animus influencing the selection criteria. A reasonable jury thus could not find that but-for an improper motive, a candidate's residency would not have been given weight in the selection

process. Likewise, while Dr. Babb received a lower interview score than the candidates ultimately selected for the position, this was a result of her lack of experience and poor interview performance rather than age discrimination. Dr. Babb has not pointed to any evidence suggesting that her application for the position was treated differently because of her age.

### 2. **Refusal to Transfer Dr. Babb to Module B**

The Court next turns to Dr. Babb's argument that she was subject to differential treatment based on age and gender when Dr. Justice denied her request for a lateral transfer to Module B in April 2013. In June 2012, Dr. Howard, who was Dr. Babb's supervisor at that time, suggested that Dr. Babb consider a primary care position in Module B of the VA that had recently been vacated. (Howard Dep. Doc. # 57 at 53:3-8). Dr. Babb originally turned down the position because she wished to remain in geriatrics, but later requested the lateral move. (Babb Decl. Doc. # 68-2 at ¶ 10). Dr. Justice denied the transfer, and the evidence shows that the Module B position did not exist at the time that Dr. Babb requested to be transferred into Module B. (Doc. # 52-2 at 185).

The denial of transfer to a non-existent position does not form the basis of a differential treatment claim. First,

Dr. Babb does not identify any differential treatment. The record shows that a younger employee (Dr. Natalia Schwartz) requested to be transferred into Module B in June of 2012, and Dr. Schwartz was also turned down because the position was not available. (Doc. # 52-2 at 185).

Dr. Babb also alleges that Dr. Justice informed her that she could not move anyone into a position without advertising, yet a male over 40 (Dr. Lobley) was moved into a PACT position without it being advertised. (Doc. # 68-2 at ¶ 21, 29). Dr. Lobley's position became a PACT position in 2011 when the PACT program began. Unlike Dr. Lobley, whose position changed due to the beginning of the PACT program, Dr. Babb is alleging differential treatment by not being moved into a position that no longer existed. The fact that the Module B position was not open at the time Dr. Babb requested the transfer distinguishes her situation from Dr. Lobley's. Even assuming that Dr. Lobley's situation is analogous, his change in position does not evince differential treatment in terms of transfer without advertising because his position *became* a PACT position two years earlier in 2011. (Doc. # 70 at 3). Dr. Babb has thus not presented evidence that any pharmacist, male or female, was "moved" into a position similar to the one Dr. Babb sought.

42

Second, even under the Babb II standard, Dr. Babb points to no evidence suggesting that age or gender discrimination was the but-for cause of her treatment. As this Court previously explained, the VA was not required to create (or hold open) a position just to accommodate a disgruntled employee such as Dr. Babb. (Doc. # 83 at 32). Dr. Babb's treatment in being denied the transfer was thus similar to that of both younger and male pharmacists.

While the provision of non-pretextual reasons for an employment action is insufficient to defeat a prima facie case of age or gender discrimination, Dr. Babb has failed to meet her burden of providing evidence from which a reasonable jury could find age or gender played any role in the VA's hiring decision. Without more, a reasonable jury could not find age or gender discrimination based on the mere fact that two younger female pharmacists were selected for the job.

For these reasons, the VA's Motion for Summary Judgment is granted as to Count II.

### C. Count III – Retaliatory Hostile Work Environment

Dr. Babb also maintains that she was subjected to a retaliatory hostile work environment because of her engaging in EEO activity. (Doc. # 127 at 15). At the time of its first Order, the Court reviewed Dr. Babb's retaliatory hostile work

environment claim under Gowski. Now, under Monaghan, "retaliatory hostile work environment claims . . . prevail if the conduct complained of 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Tonkyro, 995 F.3d at 836 (quoting Monaghan, 955 F.3d at 862).

Thus, Dr. Babb must show that she suffered harassment that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. In addition, to prevail on this claim, Dr. Babb must demonstrate a link between her EEO activity and the totality of events allegedly creating a hostile work environment. See Terrell v. McDonough, No. 8:20-cv-64-WFJ-AEP, 2021 WL 4502795, at *9 (M.D. Fla. Oct. 1, 2021) (rejecting plaintiff's retaliatory hostile work environment claim where she failed to link the allegedly adverse actions to her EEO activity).

Unlike Title VII retaliation claims, which are based on discrete acts, the "very nature" of hostile work environment claims "involves repeated conduct." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002). Hostile work environment claims are based on the "cumulative effect of individual acts," each of which "may not be actionable on its own." Id.

Dr. Babb describes numerous incidents as the basis for her retaliatory hostile work environment. These include denials of training, an evaluation of "fully successful" rather than "outstanding" in mentoring, removal of educational duties, denial of participation in negotiation of the Agreements, the loss of an Advanced Scope, the loss of pay, the non-selection for the anticoagulation position, the AIB targeting, the denial of a lateral move to Module B PACT, the leaving of reports of contact on her desk, the 2014 events, and the holiday pay issue. Many of these incidents form the basis of her Title VII retaliation and discrimination claims; specifically, the loss of an Advanced Scope, the non-selection for the anticoagulation position, the denial of a lateral move to Module B PACT, and the holiday pay issue.

Although the Court previously found that Dr. Babb's retaliatory hostile work environment claim fails under the "severe and pervasive standard," it now concludes that a reasonable jury could find that the events affecting Dr. Babb "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." (Doc. # 83 at 49); Tonkyro, 995 F.3d at 836. Notably, Babb II and Monaghan have rendered the standard for an adverse employment action in a retaliatory hostile work environment claim coterminous with

45

that in a Title VII retaliation claim. Babb II, 992 F.3d at 1209; Monaghan 955 F.3d at 862. Because each discrete act underlying Dr. Babb's Title VII retaliation claim meets the "might have dissuaded" standard, the cumulative effect of these acts also meets the standard for the purposes of Dr. Babb's retaliatory hostile work environment claim. For the same reasons the Court has denied the VA's Motion as to Dr. Babb's Title VII retaliation claim, summary judgment in favor of the VA is denied as to the retaliatory hostile work environment claim.

As this Court previously explained, Dr. Babb has described adverse employment actions directly impacting the terms of her employment — specifically, her pay (including holiday pay).

As with Dr. Babb's Title VII retaliation claim, a reasonable jury could find that the temporal proximity between Dr. Babb's EEO activity and her adverse employment actions demonstrates a causal link. The removal of Dr. Babb's Advanced Scope, her non-selection for the anticoagulation position, and reduced holiday pay all occurred within a short period of time following her EEO activity. A reasonable jury could find that the close temporal proximity between Dr.

Babb's EEO activity and the adverse actions established causation.

After due consideration, the Court denies the VA's Motion for Summary Judgment as to Dr. Babb's hostile work environment claim.

## IV. Conclusion

For the reasons given above, summary judgment is denied on Counts I and III. The Motion is granted as to Count II.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendant the Secretary of Veterans Affairs' Motion for Summary Judgment (Doc. # 52) is **GRANTED** in part and **DENIED** in part.

(2) Summary judgment is granted in favor of Defendant on Count II.

(3) Summary judgment is denied as to Counts I and III.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 19th day of August, 2022.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE